Lee Gieseke, Administrator of the Estate of William Gieseke, Deceased, Plaintiff-Appellee, v. Hardware Dealers Mutual Fire Insurance Company, a Corporation, and M. F. Wallensack, Defendants-Appellants.

Gen. No. 11,745.

Second District, First Division.
December 31, 1963.

Berchem, Schwantes & Thuma, of Chicago (Michael J. Thuma and Richard Owen Young, of counsel), for appellants.

Carbary & Carbary, of Elgin (Geo. D. Carbary and John W. Gustafson, of counsel), for appellee.

DOVE, J.

The plaintiff, Lee Gieseke, Administrator of the Estate of William Gieseke, deceased, filed his three-count complaint in the Circuit Court of Kane County seeking recoveries against Hardware Dealers Mutual Fire Insurance Company and M. F. Wallensack. Counts One and Two are not involved in this appeal. The issues made by Count Three and the defendants' answer thereto were heard by the court, without a jury, resulting in a judgment against both defendants for $10,000 and they appeal.

Count Three alleged that plaintiff's intestate, William Gieseke, on or about October 1, 1960, ordered and contracted for a certain policy of insurance with the defendant, Hardware Dealers Mutual Fire Insur-

ance Company, through its duly authorized agent, M. F. Wallensack, at the agency of the company in Elgin, Illinois; that the insurance contracted for was casualty insurance on his 1958 Corvette automobile; that said order and contract for insurance was for "like insurance coverage with that then and there possessed by his father, Lee Gieseke, which said Lee Gieseke then and there had in force and effect with defendant, Hardware Dealers Mutual Fire Insurance Company, covering a 1959 Plymouth Savoy automobile; that the coverages on said policy included bodily injury liability, collision or upset, with $100 deductible feature, death indemnity in the principal sum of $10,000 and total disability with a weekly indemnity of $50; that the premium therefor in the sum of $221.69 was arranged on credit terms of $73.90 on receipt of policy, $73.90 on November 1, 1960, and $73.90 on December 1, 1960, which said decedent was prepared to pay in accordance with such arrangement."

The complaint then alleged that on October 15, 1960, while the insurance coverage so ordered by plaintiff's decedent was in full force and effect, but before the delivery to him of the written policy of insurance, decedent drove his insured vehicle off the paved portion of the highway upon which he was travelling and received injuries from which he died the same day.

This count of the complaint then alleged that the policy of insurance so ordered and contracted for, "when delivered to decedent after his death," did not contain provision for payment of benefits thereunder for accidental death in accordance with the order for and contract of insurance and assurance of the agent.

The answer of the defendants denied that decedent ordered or contracted for insurance coverage like that possessed by or in effect with Lee Gieseke, denied that decedent ordered or contracted for any such cov-

erage as alleged, admitted that the policy issued did not contain any provision for the payment of benefits thereunder for accidental death and denied that there was any order for such insurance by deceased or any contract therefor on behalf of defendants or either of them.

Upon the hearing Lee Gieseke testified that on or about October 1, 1960, his son, William, purchased a 1958 Corvette automobile; that about that date he called defendant, Wallensack, on the phone and, as abstracted, this witness said: "In the conversation between Mr. Wallensack and I, we talked about insurance for my son's car. I was contracting the insurance for my son. I told Mr. Wallensack that he was purchasing the car Saturday and that I wanted the same contract of insurance as I had. Mr. Wallensack read out the coverages in my policy and came up with a price. At the time of the conversation I had my policy of insurance on my car. I told Mr. Wallensack that my son would take delivery of his car on October 1, 1960, the Saturday following the conversation. I knew at that time that Mr. Wallensack represented Hardware Dealers Mutual and he discussed with me the various provisions in my policy. The provisions of the policy were fifty and one hundred thousand liability, uninsured motorist protection, the $10,000 death clause, the $100 deductible, medical coverage and so forth. We discussed the fact that Mr. Wallensack was to break the premium payment up into three payments, due about 60 days apart. Mr. Wallensack gave me a rough figure of $247 as the cost of the policy. At that time I had my own automobile and insurance coverage on it. The conversation between Mr. Wallensack and I ended about that time. Mr. Wallensack said he would take care of it for me."

Lee Gieseke further testified that the next time he had any further conversation with Mr. Wallensack

was on October 13, 1960, at which time Wallensack called him over the phone and told him that the insurance could not be issued with liability limits of fifty and one hundred thousand dollars, and that it would be issued with limits of twenty-five and fifty thousand dollars.

On cross-examination Mr. Gieseke stated that he did not know the motor or serial number of his son's automobile but that information was given Mr. Wallensack by the insured, William Gieseke. Lee Gieseke further testified that when Mr. Wallensack phoned his home on October 13, 1960, he, Lee Gieseke, answered the phone and that Wallensack talked to him first and then Wallensack talked to his son, William, the insured.

Merle Gieseke testified that she was the wife of Lee Gieseke and mother of the insured, William Gieseke; that she was present when her husband had his first phone conversation with Mr. Wallensack; that she could not hear what Wallensack said to her husband, but heard her husband say to Wallensack that he, her husband, "wanted insurance for our son's car and that he wanted the same policy my husband, himself, had."

The only other witness who testified on behalf of the plaintiff was Morris F. Wallensack, who was called by the plaintiff under Section 60 of the Practice Act. Mr. Wallensack testified he had lived in Elgin sixteen years; that he was an insurance agent for Hardware Dealers Mutual Fire Insurance Company and that he had known Lee Gieseke for eight years but had not sold him the policy referred to in the record as Plaintiff's Exhibit No. 1. This witness testified that this policy was not sold through his agency and he did not know the name of the agent who sold it to him. This witness also identified the policy covering William Gieseke's automobile and stated that it was written

135

through his agency. He further testified that the rates set forth in Plaintiff's Exhibit 2, which was the policy covering William Gieseke's automobile, reflected the correct rates for the coverages enumerated in that policy.

Mr. Wallensack further testified that before the policy covering William Gieseke's automobile was issued he discussed that insurance with Lee Gieseke briefly; that for an accidental death provision in the principal sum of $10,000 in such a policy as that issued to William Gieseke, the premium would be four dollars a year; that such coverage was not requested by Lee Gieseke at the time he discussed William Gieseke's insurance policy with Lee Gieseke and that the weekly indemnity provision was also not requested to be included in the William Gieseke policy by Lee Gieseke.

This witness, Mr. Wallensack, further testified that on or about October 1, 1960, he was contacted by William Gieseke in relation to insurance coverage on his 1958 Corvette automobile; that the original call for that insurance came from Lee Gieseke; that when Lee Gieseke stated he wanted the same insurance coverage on his son's car that he had on his car, Mr. Wallensack said, "Well, now let's get these specific coverages down. What do you want?" To this query Lee Gieseke stated that William Gieseke was there and that he, Wallensack, "could talk to him and that it was time for him to discuss what he wanted."

When called as a witness to testify in his own behalf, and in behalf of his co-defendant, Mr. Wallensack, referring to the initial telephone conversation he had had with Lee Gieseke, said that conversation took place on September 30, 1960, and that Lee Gieseke stated that his son, Bill, wanted insurance; that Wallensack then asked him what type of coverage William wanted and Lee Gieseke replied: "Well

make it the same as mine." As abstracted this witness continued: "I then began to question Lee Gieseke specifically concerning whether he wanted each of the individual coverages in his policy to be included in William Gieseke's policy, at which point Lee Gieseke said, 'Bill is here. He can discuss that with you.' He then called Bill or William to the telephone and I talked with William Gieseke about his own insurance coverage."

At this point counsel for the plaintiff objected to any conversation between this witness and plaintiff's intestate on the ground that under Section Two of the Evidence Act, this testimony was incompetent. The court permitted the witness to continue, subject to this objection.

Mr. Wallensack then testified: "We went down the various coverages in his father's policy coverage by coverage. The first thing I asked him was what limits of liability he wanted and, after discussion, he accepted the fifty and one hundred thousand limits. He accepted a $10,000 property damage limit. We discussed and he accepted the medical pay provisions of the policy which, I believe, was $2,000. As we discussed each coverage I gave him a premium quotation for that coverage. I asked him whether he wanted fifty dollar deductible or one hundred dollar deductible collision insurance and he selected the $100 deductible. I explained to him that for four dollars per year he could have a ten thousand dollar accidental death benefit, and for six dollars a year, a fifty dollar a week total disability benefit. William Gieseke said no, that he didn't want those coverages. I next asked him about the serial number of the car, but he did not have it available at that time, neither was the price of the car then available. He knew the model of the car when I asked him. As to the method of paying the premiums on this policy, I told him that he could pay

137

one-third of the premium down, one-third in thirty days and one-third in sixty days, and he selected that method of payment. That was the extent of my conversation with William Gieseke concerning his insurance. We agreed that he was to call me the next day and give me the information that he did not have that night, the serial number of the car and the mortgagee's name. I believe that was all of my conversation with him."

This witness further testified, subject to the objection as to its competency, that on the following day the insured gave him the serial number of his car and told him the actual purchase price he paid therefor, and that a loss payable clause should be made to the Union National Bank of Elgin, mortgagee. The court reserved its ruling on the motion of the plaintiff to strike this testimony.

Without objection this witness then testified that after this conversation with insured he prepared a formal application for insurance coverage on the William Gieseke car, which was submitted to the defendant insurance company. This application was not signed by the insured, but by defendant Wallensack. The application was returned to Wallensack, who again contacted William Gieseke by phone and, over objection of counsel for plaintiff, Mr. Wallensack testified that he informed William Gieseke that the maximum limit of bodily injury liability the underwriting department of defendant would allow would be twenty-five thousand and fifty thousand dollars; that William said he did not have too much and that the lower limits would be satisfactory.

Mr. Wallensack then testified that he made the requested change on the application, resubmitted it to the company and never had any further talk with either William or Lee Gieseke until after the accident

on October 15, 1960, which resulted in William Gieseke's death.

The record discloses that the policy which was issued by the defendant company insured William Gieseke from October 1, 1960, to October 1, 1961. The coverages enumerated are (a) bodily injury liability with a $25,000 limit for each person and a $50,000 liability for each occurrence, and that the premium for this coverage is $86.24; (b) property damage liability—$10,000 for each occurrence, premium $49.50; (c) medical payments, $2,000, premium $11.70; (d) collision—$100 deductible, premium $56; (e) comprehensive, excluding collision, premium $16; (f) uninsured motorist, each person, $10,000—each accident, $20,000, premium $2.25. These premiums aggregate $221.69. Mr. Wallensack received this policy on October 21, 1960, after the death of the insured. He shortly thereafter delivered it to the home of insured's parents, Mr. and Mrs. Lee Gieseke, with whom the insured, single and 23 years of age, made his home.

The record further discloses that the reason the first application submitted by Mr. Wallensack to the defendant company was not accepted was because, under the rules of the company, any male driver under the age of twenty-five, who is the principal operator of the insured automobile, was not accepted if the bodily injury limits were in excess of twenty-five thousand dollars per person and fifty thousand dollars per accident.

In disposing of the case the trial court held that the conversations testified to by Mr. Wallensack which he had with the insured were incompetent; that proper objections had been made thereto; that the plaintiff had proved the allegations of his complaint and, accordingly, the court rendered judgment for the plaintiff for $10,000, as indicated.

The complaint in this case charged that the insured ordered a policy of insurance in the same company and with like coverage as Lee Gieseke, the father of insured, had previously obtained from the same insurance company and which was in force and effect at the time insured ordered his policy. There is evidence which sustains this allegation, and the evidence also discloses that when this insurance was ordered for William Gieseke, Lee Gieseke was insured under the provisions of a policy issued by defendant company which contained a $10,000 accidental death coverage. All the evidence, however, is that the order for the William Gieseke policy was directed to Mr. Wallensack, as agent of defendant company, and not to Mr. Wallensack personally. The complaint did not allege, nor does the proof show, that Mr. Wallensack bound himself personally to plaintiff's intestate in any sum. It was never contemplated by anyone that Mr. Wallensack was obligated to the estate of the insured for $10,000 in the event the insured sustained an accidental death, as indicated by the coverage in Lee Gieseke's insurance policy.

The proof is that when Lee Gieseke ordered this policy, all that Wallensack said was that he would take care of it. Lee Gieseke represented the insured in contacting Wallensack, and in all the dealings he and his son had with Wallensack they dealt with him as the agent of Hardware Dealers Mutual Insurance Company and in that capacity alone. Mr. Wallensack was not the insurer. What the insured sought to obtain was a Hardware Dealers Mutual Insurance Company policy like the policy which theretofore had been issued by this company to Lee Gieseke.

Counsel for appellee cite several cases dealing with the liability of an insurance broker for failure to obtain an insurance policy. These cases are not persua-

sive here since plaintiff pleaded and proved that Wallensack was the agent of Hardware Dealers Mutual Fire Insurance Company and he had no other role or relationship in the issuance of an insurance policy. In the complaint, Mr. Wallensack is not mentioned, except as the agent of Hardware Dealers Mutual Insurance Company.

Counsel for appellee insist that the judgment against M. F. Wallensack should stand because he assured Lee Gieseke that an insurance policy would be issued with specific coverages like those contained in the policy defendant insurance company had issued to Lee Gieseke; that by such assurance, he thereby obligated himself to see that the policy was so issued and having failed to do so, he is personally liable.

[1] The evidence is that Mr. Wallensack stated to Lee Gieseke that he would take care of procuring this insurance for his son. The evidence does not disclose that Mr. Wallensack bound himself personally. Any statement Mr. Wallensack may have made was made as an agent of the insurance company he represented, and Lee Gieseke and William Gieseke knew it and so considered it. To be binding on the agent personally, it must appear that the agent substituted his responsibility for that of his principal, or that he has pledged his responsibility in addition to that of his principal. (Marcus Lowe Booking Agency v. Princess Pat, Ltd., 141 F2d 152, 154–5.)

"It is considered a well-settled principle of law in Illinois that an agent is not liable for the acts of a disclosed principal unless he takes an active part in violating some duty the principal owes to a third person. An agent acting within the scope of his authority is not liable on an undertaking or contract for the principal where he expressly discloses his agency or the person dealing with him knows of the agency un-

less the agent binds himself either expressly or by inference to become personally responsible." (1 ILP Agency, sec 130.)

"If a contract is made with a known agent acting within the scope of his authority for a disclosed principal, the contract is that of the principal alone, unless credit has been given expressly and exclusively to the agent, and it appears that it was clearly his intention to assume the obligation as a personal liability, and that he has been informed that credit has been extended to him alone." (2 Am Jur Agency, sec 315.)

The record discloses that on January 9, 1961, both defendants joined in filing a single answer to plaintiff's three-count complaint. At the opening of court of the day the case was set for trial, June 28, 1962, defendants moved for leave to withdraw the answer insofar as M. F. Wallensack was concerned, and for leave to file a motion to dismiss the complaint. The motion was heard and the court reserved its ruling thereon. At the close of plaintiff's case, counsel for defendant brought to the attention of the court its motion to dismiss the complaint as to defendant M. F. Wallensack, but the court again reserved its ruling thereon. Following this ruling, each defendant, separately, moved the court to find the issues against the plaintiff and in favor of each defendant. The court reserved its ruling upon each of these motions and the trial proceeded with the introduction of evidence on behalf of the defendants. At the conclusion of all the evidence, the defendant, Wallensack, again moved for a finding and judgment in his favor, as did his co-defendant, Insurance Company. The court again reserved its ruling upon these motions.

■ Counsel for appellee state that because defendants did not obtain specific rulings upon these motions, they are precluded from having these motions considered on review. There is no merit in this con-

tention. The joint judgment rendered by the trial court can be affirmed by this court only if it is sustained by the evidence found in the record. In the instant case plaintiff sued both the agent and the principal and procured a judgment against both. The plaintiff assumed the burden of proving this joint liability. (1 ILP Agency, sec 235, citing Limousine and Carriage Mfg. Co. v. Shadburne, 185 Ill App 403.)

In our opinion the evidence does not sustain the judgment appealed from, and that judgment is reversed and the cause remanded with directions to the lower court to render judgment in favor of the defendant, M. F. Wallensack, and in bar of the action as to this defendant.

As long as M. F. Wallensack remained in the case as a defendant, he was not a competent witness to testify in his own behalf as to the conversations he had with plaintiff's intestate. (Ill Rev Stats 1963, c 51, § 2.)

Judgment reversed and cause remanded with directions.

McNEAL, P. J. and SMITH, J., concur.