LAWNDALE STEEL COMPANY, Plaintiff-Appellant, *v.* JOE APPEL, Defendant-Appellee.

Second District    No. 80-271

Opinion filed July 14, 1981.

Stuart Smith, of Wexler, Siegel and Shaw, Ltd., of Chicago, for appellant.

Martin Becker, of Skokie, for appellee.

Mr. JUSTICE LINDBERG delivered the opinion of the court:

This is an action by a creditor to collect on a contract of guaranty. After a bench trial, the Circuit Court of Lake County directed a verdict in favor of the defendant-guarantor. From this verdict, plaintiff appeals.

Lawndale Steel Company is engaged in the business of selling steel and steel products. Joe Appel is a steel broker. During the months of June and July 1973 Appel approached Lawndale on behalf of himself and Modular Technology Corporation to structure a business deal between the parties. Appel sought a commitment from Lawndale to supply to Modular all the steel it would need for a construction project in Lubbock, Texas. In return, Appel would receive a commission on the sale of the steel. Lawndale had never dealt with Modular before, and investigation showed that it was not a particularly strong company from a financial standpoint. In its negotiations with Modular, Lawndale therefore endeavored to secure guarantees that payment would be made.

A contract (hereinafter the Agreement) was initially prepared in June 1973. Although there is much confusion in the record with respect to the dating or post-dating of the Agreement, Appel testified that he signed the Agreement in June. Among other terms, the Agreement required that Modular purchase certain quantities of steel specified in purchase orders attached to the Agreement, at a rate of $13/cwt; that payment was to be made upon delivery; and that any future modification of terms be in writing. In addition, the Agreement provided:

"B. To secure payment, Buyer shall deliver an irrevocable, standby letter of credit drawn on the State Bank of St. Charles in the amount of Eighty Thousand dollars ($80,000.00) in favor of Seller, which letter of credit shall be paid over to Seller in the event that the full purchase price is not paid within forty-five (45) days from the date of invoice by Seller to Buyer. Said letter of credit shall be unconditional and in the event that the final delivery has not been made, or that the full purchase price has not been paid within five (5) days prior to the expiration of the letter of credit, Buyer shall either pay the full amount due in cash or shall substitute a new letter of credit on the same terms and conditions and for the same period of time or in the event that Buyer shall not so pay in cash or replace said letter of credit, Seller may, at its sole discretion, cash

the then existing letter of credit for the full amount of the purchase price; and

C. Further, Buyer and Joe Appel shall personally guarantee the obligation it undertakes by corporate signature on appropriate notes, which notes shall be further guaranteed by the President of Buyer personally."

On August 14, 1973, the original Agreement was amended to make payment due within 45 days of Lawndale's invoice (rather than upon delivery) in order to comply with the terms of a letter of credit obtained by Modular. The amendment was signed by the presidents of both Lawndale and Modular, but not by Appel. Although Appel could not remember if he saw the amendment, the president of Lawndale, Stuart Barnett, testified that it was Appel who took the Agreement with the amendment to Modular for signature. Barnett added that Appel must have been aware of it since he spent "nearly every day through the entire running of this contract in our office, either directly involved with the Modular Technology matter, or using office space, or being generally concerned with the order. He was intimately involved with everything that was going on with the contract." Appel, too, admitted that he was often at Lawndale, until a "certail fall-out" at an unspecified time.

Upon execution of the Agreement and amendment, Lawndale began shipping steel to Modular, which paid for the steel according to the terms of the Agreement. Neither Appel nor the president of Modular, however, ever signed the "appropriate notes" specified in the Agreement, personally guaranteeing the contract.

In mid-1974, because of price increases of raw steel at the mill, Lawndale sought a modification in the contract price. Letters confirming an increase from $13/cwt to $17.56/cwt were exchanged between Lawndale and Modular on May 10 and July 31. Appel did not sign the modification, nor was he asked to. In their testimony, Appel and Barnett disagreed as to whether Appel ever saw the letters, although Appel admitted that he might have had a conversation with Barnett on the subject of price increases.

In August the final three orders of steel under the contract were delivered to Modular pursuant to the new price. On August 31 the letter of credit expired. When no payment for the final orders was received, Barnett, in October or November 1974, called Modular and arranged for interest at the rate of 1%/month on the amount due. According to Barnett, Appel listened on another telephone in Barnett's office to this conversation. Appel, however, denies any knowledge of the conversation.

No further payments were made by Modular. In February 1975 Modular filed a petition in bankruptcy. At the time of the August 1974 shipments, it was indebted to Lawndale for $18,976.95. Lawndale has

since received $6,774.25 from the bankruptcy court, leaving $12,202.70 outstanding.

Based upon this evidence, the trial court found that "the guarantee of the Defendant as to instant contract was conditioned upon Plaintiff exercising its contractual right to hold an irrevocable standby letter of credit drawn on the State Bank of St. Charles to first secure payment." Accordingly, judgment was entered in favor of defendant Appel. No findings as to Appel's other defenses were made.

## I

■■ ■ Plaintiff first challenges the trial court's finding that Appel's guaranty was conditional. A guaranty may be absolute or conditional. A conditional guaranty requires the happening of some contingent event before the guarantor will be liable on his guaranty. (*State Bank v. Cirivello* (1978), 74 Ill. 2d 426, 386 N.E.2d 43.) An absolute guaranty is an unconditional undertaking on the part of the guarantor that the person primarily obligated will pay or otherwise perform. Such guarantor is liable immediately upon default of the principal, without notice. An absolute guaranty, unlike a conditional one, imposes no duty upon the creditor or holder of the obligation to attempt collection from the principal debtor before looking to the guarantor. *United States v. Shirman* (N.D. Ill. 1966), 41 F.R.D. 368.

■■ Defendant contends that his guaranty was subject to two conditions: first, that Lawndale secure the personal guaranties of Appel and the president of Modular on notes, independent of their signatures on the Agreement; and second, that Lawndale exercise its contractual right to hold an irrevocable letter of credit so as to first secure payment in the event of Modular's default. Although the Agreement did require Appel and Modular to execute appropriate notes to guarantee the obligations, we do not believe that the execution of the notes was itself a condition to the enforceability of the guaranties. Both Appel and Modular (by its president, Victor Lee) signed the Agreement obligating themselves to pay for the steel, and to sign the notes of guaranty. They were bound to perform these obligations even though no independent notes were actually signed. In *Walter A. Wood Mowing & R. M. Co. v. Trexler* (1901), 97 Ill. App. 170, defendant agreed to guarantee the payment of a note but failed to execute the blank guaranty on the reverse side. The defendant claimed that the guaranty could not be enforced since he had not executed the blank guaranty form. The court, in holding that defendant was liable on the guaranty stated:

"To say * * * that by appellee's failure to guarantee the payment of the notes on the back of them, that he was not bound to pay them, because he had not put his guaranty upon them, is in effect

saying that he had reserved the power, or at least the privilege, of nullifying his own agreement by doing nothing at all. A construction of the agreement that leads to such a result can not be tolerated." 97 Ill. App. 170, 173-74.

Similarly, both Appel and the president of Modular, by signing the Agreement, personally committed themselves to guarantee its performance by signing notes, which guaranties cannot be avoided by later failing to execute the notes. As in *Trexler*, they will not be permitted to nullify their own agreement by doing nothing at all. Although it is true that Victor Lee, the president of Modular, signed the Agreement in his capacity as president on behalf of Modular, he will still be held personally liable where, as here, he expressly agreed in addition to personally guarantee the notes. (*Dunlop v. McAtee* (1975), 31 Ill. App. 3d 56, 333 N.E.2d 76; *Gieseke v. Hardware Dealers Mutual Fire Insurance Co.* (1963), 46 Ill. App. 2d 131, 195 N.E.2d 32; 1 Ill. L. & Prac. *Agency* § 130 (1953).) Appel would therefore not be deprived of his equitable right of contribution as against Lee. Compare *State Bank v. Cirivello* (1978), 74 Ill. 2d 426, 434, 386 N.E.2d 43, 47.

Defendant's reliance upon *Cirivello* is misplaced. There, a bank negotiated a loan with a limited partnership composed of 13 members. The bank was advised by one of the limited partners that he did not want to be liable for more than his share in the partnership. The bank in turn advised the limited partners that no loan would be made unless all 13 signed the guaranty. Despite this assurance, the bank make the loan with only 12 of the 13 signatures. Upon default, the bank sued all of the limited partners on their contracts of guaranty. The Illinois Supreme Court, affirming a verdict for defendants, observed:

> "By representing that the loan would not be advanced without the personal guaranties of all limited partners, Ryan [the bank president] was also representing that the guaranty would not become effective unless all 13 signed. There was every reason for all the parties involved to assume that the conditional nature of the loan and the conditional nature of the guaranty were indivisible." 74 Ill. 2d 426, 433, 386 N.E.2d 43, 46.

Unlike *Cirivello*, there were no representations in our case that either the Agreement or the guaranty of Appel would become effective only when the notes were signed. The requirement that they sign the notes, rather than being a condition upon Appel's guaranty, was an additional obligation under the Agreement which ran in favor of Lawndale and in no way affected Appel's risk. Appel accepted the benefits of that Agreement and should not now be permitted to avoid his obligation on this ground.

Defendant's reliance on the second alleged condition, that Lawndale

was required to exercise its right to hold a letter of credit, is also misplaced. It should be noted that this is the sole basis upon which the trial court ruled in defendant's favor. The pertinent language, set forth in its entirety above, provides that in the event that the Buyer (Modular) has not paid the full purchase price of an order within 5 days prior to the expiration of the letter of credit, or replaced the expiring letter with another,

> "* * * Seller *may, at its sole discretion,* cash the existing letter of credit for the full amount of the purchase price." (Emphasis added.)

■■ The Agreement grants to Lawndale in its sole discretion the right to recover under the letter of credit. Any action it took or did not take with respect to the letter was therefore permissive and not mandatory. Since Lawndale was not required to take any action on the letter of credit, it cannot be considered a condition of Appel's guaranty. Like the notes discussed above, the letter of credit was simply another device available to Lawndale under the Agreement to ensure payment.

## II

As an alternative ground for affirming the decision of the trial court, defendant argues that he should be discharged because the terms of the Agreement were materially altered after he signed the guaranty. (*Claude Southern Corp. v. Henry's Drive-In, Inc.* (1964), 51 Ill. App. 2d 289, 201 N.E.2d 127.) Specifically, defendant contends that modification of the Agreement with respect to the terms of payment, the bank designated to issue the letter of credit, the price of the steel, and imposition of interest on amounts past due materially altered his obligations under the guaranty.

■■ Two exceptions to the rule discharging a guarantor for alteration of the underlying contract should be noted. First, the rule does not apply where the essentials of the original agreement have not been changed and the performance required of the principal is not materially different from that first contemplated. (*Claude Southern Corp. v. Henry's Drive-in, Inc.* (1964), 51 Ill. App. 2d 289, 301-02, 201 N.E.2d 127, 133.) Second, the rule has no application where the guarantor has knowledge of and assents, either expressly or by implication, to such change. *Bank of Commerce v. Riverside Trails* (1977), 52 Ill. App. 3d 616, 367 N.E.2d 993.

Generally, an extension of the time for payment, here from the time of delivery to 45 days after delivery of each order, would discharge the guarantor if granted without his knowledge or consent. (*White v. Walker* (1863), 31 Ill. 422; 20 Ill. L. & Prac. *Guaranty* §64 (1956).) However, a guarantor will not be discharged by an extension of time for payment where he expressly or impliedly consents thereto. (*Continental Illinois National Bank & Trust Co. v. Cardwell* (1936), 287 Ill. App. 227, 4 N.E.2d

770.) Under the rule of *Riverside Trails,* the overwhelming evidence of Appel's knowing acquiescence to this alteration over the course of almost a year bars his later objection.

For the same reason, Appel is barred from objecting to Lawndale's use of a different bank from that specified in the contract for the purpose of issuing the letter of credit. Moreover, defendant has failed to suggest how this alteration in any way affected the essential terms of the original Agreement.

■■ The increase in price, on the other hand, presents a serious question as to whether defendant may have been prejudiced by increasing the extent of his liability over that contemplated in the Agreement. Although Lawndale argues that Appel also knew of this modification and acquiesced in it, the record shows only that there was a disagreement on this point in the testimony of the two sides. An appellate court is obliged to accept those inferences arising from conflicting evidence which support the judgment of the trial court. (*In re Estate of Gigele* (1978), 64 Ill. App. 3d 136, 380 N.E.2d 1144.) Unlike the other modifications which were impliedly accepted by Appel over the course of performance of the contract, the price increase came at the very end of the contract term and was of no benefit to Appel who received no commissions therefrom. Insofar as this amendment materially altered his obligation, he must be released from his contract of guaranty. *Cf. King Korn Stamp Co. v. Guaranty Bank & Trust Co.* (1969), 114 Ill. App. 2d 428, 252 N.E.2d 734 (extension of credit in excess of amount set out in agreement discharged guarantor); 38 C.J.S. *Guaranty* §72 (1943).

Lawndale contends that because Appel's liability for the three unpaid shipments is less than the amount anticipated under the initial Agreement, he has not been prejudiced by the increase in price and should remain liable up to the original amount. Under the price term in the Agreement ($13/cwt), the value of the past due shipments would be $13,321.62. Lawndale is seeking only $12,742.57 (plus statutory interest), having already recovered more than $6,000 from the bankruptcy court. It is therefore Lawndale's position that the Agreement remains enforceable according to its original terms, and that Appel would be released, if at all, only for amounts sought in excess of those terms. *Union Carbide Corp. v. Katz* (7th Cir. 1973), 489 F.2d 1374.

■■ Defendant, on the other hand, relies on the general presumption in the law which narrowly construes the terms of a guaranty in favor of the guarantor. (*Farmers State Bank v. Doering* (1980), 80 Ill. App. 3d 959, 400 N.E.2d 705; *Telegraph Savings & Loan Association v. Guaranty Bank & Trust Co.* (1978), 67 Ill. App. 3d 790, 385 N.E.2d 97.) In *Telegraph Savings & Loan Association,* the court stated the rule:

"Under well-established Illinois law, a guarantor is to be ac-

corded the benefit of any doubt which may arise from the language of the contract; his undertaking is to be strictly construed; his liability is not to be varied or extended beyond its precise terms by construction or implication; and he is bound only to the extent and in the manner and under the circumstances pointed out in his obligation." (67 Ill. App. 3d 790, 794, 385 N.E.2d 97, 100.)

Applying this rule of strict construction to the case before us, we conclude that Appel should be fully released from his guaranty.

Plaintiff's citation to *Union Carbide* is inapposite. In that case the guarantor, a major stockholder in a warehouse company, signed a guaranty for goods purchased on credit which specifically limited his liability to $150,000. There was, however, no limitation on the aggregate amount of credit to be extended the company under the contract. Upon default, the guarantor contended that because the creditor had extended $230,000 credit to the company, $80,000 in excess of his guaranty, he should be released of his entire obligation. The court held that he was liable to the extent of his agreement ($150,000). The fact that more credit had been extended than he had guaranteed was irrelevant since there was no limitation in his guaranty upon the amount of credit which the company could receive. The only limitation was on the guarantor's liability. In short, there was no alteration of the term governing the amount of credit because there was no term limiting credit in the agreement to alter.

■■ Our case is different. Here, a specific price term was agreed upon and then increased by one third without the guarantor's consent. This modification substantially altered Lawndale's obligation. It is entirely possible that a considerable raise in price could contribute to a default. It certainly varied the "manner" and "circumstances" (*Telegraph Savings & Loan Association*) of Appel's original obligation under his contract of guaranty, and increased his risk. In any event, the test of materiality is not whether the alteration ultimately harmed or benefitted the guarantor, but whether it substantially affected a contractual right. As a California court stated:

"Where the main contract is altered without the consent of the guarantor and in respects so material as to change the substantial rights of the parties thereto and in effect to make a new contract, the guarantor is exonerated. * * * This is true whether the effect of the alteration is to increase or to lessen the obligation, performance of which is guaranteed." (*Boteler v. Conway* (1936), 13 Cal. App. 2d 79, 82, 56 P.2d 587, 588-89.)

We therefore find that the substantial increase in price here was sufficiently material to release the defendant from his guaranty.

Because of our disposition of this case on the basis of the altered price

term, we need not decide whether Lawndale and Modular's agreement to levy interest on amounts in default materially affected Appel's obligation, or whether it was merely a collateral agreement which left Appel's obligations undisturbed. Accordingly, the judgment of the Circuit Court of Lake County releasing the guarantor is affirmed.

Affirmed.

REINHARD and UNVERZAGT, JJ., concur.