### In re CHICAGO DISCOUNT COMMODITY BROKERS, INC., Debtor.

John K. NOTZ, Jr., Trustee, Plaintiff,

v.

Dr. Wayne B. TATE, Dr. Wayne B. Tate PA Pension Trust, Mrs. Alice C. Tate and Mrs. Alice C. Tate as Trustee, Defendants.

Bankruptcy No. 80 B 14472.
Adv. No. 82 A 3887.

United States Bankruptcy Court,
N.D. Illinois, E.D.

June 27, 1985.

On Motion for Reconsideration
Jan. 22, 1986.

See also, 58 B.R. 626.

Stephen P. Bedell, David F. Heroy, Keith E. Graham, of Gardner, Carton & Douglas, for Notz.

Katrina Veerhusen of Kevin M. Forde, Ltd., for Tate, et al.

Kenneth Denberg of Siegel, Denberg, Vanasco, Shukovsky, Moses & Schoenstadt, for Weiner.

Richard Golding of Lord, Bissell & Brook, for CLDC Management Corp.

Susan Pierson DeWitt, U.S. Trustee.

James J. Crowley of Loftus & Crowley, for Geschke.

## MEMORANDUM OPINION

JOHN D. SCHWARTZ, Bankruptcy Judge.

### Nature of Proceedings

This proceeding comes before the Court on cross-motions for summary judgment. The debtor was a futures commission merchant. The debtor's Trustee seeks to recover deficits in the commodity futures trading accounts of certain of the defendants and to disallow or subordinate the claims of certain other of the defendants.

### Procedural Background and Facts

#### Procedural History

On November 4, 1980 a voluntary petition for relief under subchapter IV of Chapter 7 of the Bankruptcy Code (11 U.S.C. § 101 et seq.) was filed on behalf of Chicago Discount Commodity Brokers, Inc. ("CDCB") by its then court-appointed receiver and present trustee, John K. Notz, Jr. ("Trustee").

On January 12, 1981, defendants, Dr. Wayne B. Tate ("Tate") and his wife, Mrs. Alice C. Tate ("Mrs. Tate"), individually and as individual trustees, filed claims against CDCB in order to recover positive balances in their trading accounts.

On October 28, 1982 the Trustee filed an adversary proceeding against the defendants. On August 13, 1984 following a filing of responsive pleadings and a stipulation of certain facts, the parties filed cross-motions for summary judgment. Each of the parties filed memoranda and replies in support of their respective motions.

#### Summary of Facts

CDCB traded commodities as a "futures commission merchant" as defined in the Commodity Exchange Act (7 U.S.C. § 2). In September of 1979 Tate became a shareholder in CDCB when he purchased over 10% of CDCB common stock. On September 14, 1979 Tate and certain other shareholders and individuals associated with CDCB executed an agreement in which the parties to the agreement became guarantors of the "individual accounts of each other, to the extent of available balances within their respective individual accounts."

Prior to November 4, 1980, Tate traded commodities future contracts through three personal trading accounts at CDCB. Tate also traded commodities in a fourth account on behalf of the Dr. Wayne B. Tate P.A. Pension Trust ("Tate P.A."), a Maryland corporation of which Tate owns 99.8% of the outstanding stock.

Mrs. Tate traded commodities future contracts through two personal trading accounts, and also in a third account as Trustee for the benefit of the Tate children ("Tate Trust"). On May 15, 1980 Mrs. Tate executed a handwritten note authorizing Tate "to act in continuing capacity and with my full authority in the transference of funds from any and all accounts of mine and under my jurisdiction to his own and vice-versa." Prior to the November 4, 1980 bankruptcy petition transactions in Mrs. Tate's accounts were initiated by Tate with Mrs. Tate's authorization. No transfers of funds between Tate and Mrs. Tate's accounts occurred. (Stipulation of Facts: Nos. 19, 20).

By October 27, 1980 eight days before the filing of the bankruptcy petition, personal trading accounts maintained by CDCB for certain shareholders and individuals other than Tate showed a deficit of over $4.7 million. On the date of the filing, the defendants' trading accounts maintained by CDCB consisted of the following:

| Tate's Accounts | Balance |
|---|---|
| #  0070 | $ (1,100.00) |
| 0071 | 3,236.86 |
| 0073 | 17,350.11 |
| **Tate P.A. Account** | |
| #  0072 | $(12,902.60) |
| **Mrs. Tate's Accounts** | |
| #  0074 | $ 49,287.82 |
| #  0076 | 10,000.00 |
| **Tate Trust Account** | |
| #  0075 | $  1,386.55. |

The defendants filed claims seeking to recover positive balances in their respective accounts. The Trustee moved to recover deficits in the Tate and Tate P.A. accounts and to disallow or subordinate claims with respect to defendnats' other accounts.

## Discussion

### I. Net Equity Offsets

#### A. Accounts in the same capacity.

■ The issue of whether Tate can offset the deficit in one of his personal trading accounts against the positive balances in his two other personal accounts with CDCB is resolved in favor of the defendant Tate by looking to the applicable provisions in subchapter IV of Chapter 7 of the Bankruptcy Code. The Trustee's contention that an offset is prohibited under 11 U.S.C. § 763(c) is not supported by applicable provisions in subchapter IV. While § 763(c) does prohibit offsets of net equity in a customer's account against "the net equity in the account of any other customer," Tate's three personal trading accounts do not fall within the prohibition because they were held for Tate in the same capacity. This interpretation is supported by the definition contained in § 761(9)(A)(i) which provides that a "customer" is an "entity for or with whom ... a futures commission merchant deals. ..." Additionally, § 101(14) defines "entity" as a "person, estate, trust, and governmental unit." Most importantly, § 761(17) states that "net equity" refers to the "aggregate of all of a customer's accounts that such customer has in the *same capacity*." (Emphasis added). This distinction between the treatment of accounts held by a customer in the same capacity and those accounts of a customer held in a different capacity is further supported by § 763(a) which states that "[a]ccounts held by the debtor for a particular customer in separate capacities shall be treated as accounts of separate customers." Necessarily, accounts held by a customer in the same capacity should be treated as accounts of the same customer. Thus, to conclude that each customer account should be treated as a separate customer is unsupported by provisions throughout subchapter IV.

Since Tate traded commodity futures in his personal capacity as an individual trader, Tate's three personal trading accounts are treated as those of the same customer. Consequently, the Trustee's motion to enter summary judgment against Dr. Wayne B. Tate in the amount of $1,100 in order to recover the deficit in Tate's account number 0070 will be denied. An offset of the deficit in Tate's personal account number 0070 against the positive balances in his two other personal accounts is allowed.

#### B. Accounts in Separate Capacities

Under the same analysis the Trustee's motion for summary judgment against Tate P.A. is granted in the amount of $12,902.60. Pursuant to § 763(a) Tate P.A. is treated as a separate customer, because Tate was not acting in his individual capacity when he traded on behalf of the pension trust. Under § 542(b) which provides that "an entity that owes a debt that is the property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee ..." Consequently, Tate P.A. must pay the Trustee the $12,902.60 owed as of the date of the commencement of the case.

### II. Accounts Subject to the Guaranty

#### A. Tate's Personal Trading Accounts

■ The Trustee's motion for summary judgment to disallow claims for the recovery of positive balances in Tate's personal trading accounts is granted. Under an agreement executed on September 14, 1979 between and among Tate individually, CDCB, and certain shareholders and individuals associated with CDCB, each signatory became a guarantor for one another, "to the extent of available balances within their respective individual accounts." In addition, since the agreement by its terms inures "to the benefit of the Company and its ... successors and assigns", the Trustee is empowered to enforce its terms. The

nature of property of the bankrupt estate that the Trustee can seek to recover is given a broad scope under § 541(a). Such property includes "tangible and intangible property" as well as "causes of action." 4 Collier on Bankruptcy § 541.01, at 541–5 (15th ed.1985). Consequently, pursuant to § 541(a) the contractual obligations of Tate as evidenced by the Guaranty is property of the estate.

Since the aggregate deficit balance in the accounts of the individual guarantors other than Tate exceeded $4.7 million, the Trustee's motion to disallow Tate's claim is a necessary consequence of enforcing the property rights of CDCB by the Trustee. While § 763(c) prohibits the offset of net equity between customers, as defined previously, the Guaranty is a valid agreement whose legal status was not altered as a result of the commencement of the case. Therefore, the Trustee may assert his rights granted under the Guaranty as successor to CDCB. Consequently, the Trustee's motion to disallow Tate's claim to recover positive balances in his two personal trading accounts numbered 0071 and 0073 is granted.

### B. Other Trading Accounts

■ The Trustee's contention that Tate's control over the accounts of Mrs. Tate and the Tate Trust effectively subjects these accounts to the obligation of Tate under the Guaranty is not supported by the record before the Court. Mrs. Tate's handwritten authorization to Tate to allow transfers of funds in and out of her individual and trustee accounts is insufficient in and of itself to show that these accounts were in actuality Tate's accounts. Significantly, although Tate stipulated that he initiated transactions on behalf of Mrs. Tate for her accounts, the stipulations also established that no transfer of funds from her accounts to his accounts occurred either before or after the May 15, 1980 authorization was written.

The record also does not support a finding that the accounts were held as joint funds, thereby permitting their use to satisfy claims against Tate under the Guaranty. The Trustee relies on two Illinois cases, *Fisher v. Jacobs,* 39 Ill.App.2d 332, 188 N.E.2d 505 (1963); *Miller v. Standard State Bank,* 31 Ill.App.2d 189, 176 N.E.2d 639 (1961), for the proposition that a creditor can "attach joint funds of the debtor and a third party in satisfaction of the debtor's obligations subject to proof of the third party's share of ownership of the subject funds." (Plaintiff's Memorandum p. 9). But, relying on the authorization itself is insufficient to establish that the relationship between the Tate's created a "joint fund."

The Trustee further contends that Mrs. Tate's grant of authority to Tate is sufficient proof that the Tate Trust is a "sham" and therefore should be treated as Tate's personal account. To reach this conclusion the Court would have to infer that the handwritten authorization alone was intended to include the power to unlawfully withdraw funds from the corpus of the Tate Trust. The lack of any other evidence in the record makes such a conclusion too tenuous especially in light of the fact that no transfer of funds took place.

The Guaranty itself can not be used to extend Tate's obligation to include those accounts. The Guaranty is expressly limited "to the individual trading accounts of the Guarantor." This provision precludes application of the Guaranty to accounts that are not held individually. Furthermore, under governing Illinois law a guarantor's liability can not be "extended beyond the precise words of the agreement either by implication or by construction." *Castle v. Powell,* 261 Ill.App. 132, 144 (1931). *See also Lawndale Steel Company v. Appel,* 98 Ill.App.3d 167, 174–75, 53 Ill.Dec. 288, 423 N.E.2d 957 (1981). To disallow the claims of Mrs. Tate and the Tate Trust on the basis of extended obligations under the Guaranty would contradict the terms of the agreement and Illinois law. The foregoing does not preclude proof being offered at trial to establish that accounts held in the name of Mrs. Tate

and the Tate Trust by CDCB were in actuality Tate's accounts.

## III. Subordination of Proprietary Accounts

█ Under the 1982 amendments to § 766(h) "a customer net equity claim based on a proprietary account" is subordinated to net equity claims of non-proprietary customer accounts. Public Law 97–222 § 19(d) enacted on July 27, 1982 amended § 766(h) by adding the following:

Notwithstanding any other provision of this subsection, a customer net equity claim based on a proprietary account, as defined by Commission rule, regulation, or order, may not be paid either in whole or in part, directly or indirectly, out of customer property unless all other customer net equity claims have been paid in full.

By its terms the amendment applies to accounts whose ownership is by individuals with at least a 10% share of the corporation or certain other individuals, including immediate family members of such shareholders living in the same household. In pertinent part Title 17 Code of Federal Regulations (C.F.R.) § 1.3y defines a proprietary account as:

[A] Commodity futures or commodity option trading account carried on the books and records of an individual, a partnership, corporation or other type association (1) for one of the following persons, or (2) of which ten percent or more is owned by one of the the following persons:

(i) Such individual himself ...
(vi) A spouse or minor dependent living in the same household of any of the foregoing persons.

Accordingly, under the 1982 Amendment all accounts held by Tate and Mrs. Tate would be considered proprietary because of Tate's 16% ownership of CDCB's outstanding shares. But prior to the enactment of the 1982 Amendment, § 766(h) did not contain the provision subordinating claims of proprietary accounts and simply provided that "the trustee shall distribute customer property ratably to customers." The threshhold issue is whether the 1982 amendment which would subordinate the defendant's claims is applicable to this proceeding when the CDCB petition for bankruptcy was filed in 1980. As a matter of law, this Court finds that the 1982 amendment altered the existing law and should not be given retroactive effect.

In 1980 when CDCB filed for bankruptcy all customers with positive balances in their trading accounts effectively became creditors of CDCB. Additionally, at that time since no distinction was drawn between the status of proprietary and non-proprietary customer accounts under § 766(h), all customers were accorded equal treatment. Only after the enactment of the 1982 Amendment to § 766(h) were proprietary accounts accorded a lesser status than non-proprietary accounts.

While the legislative history of the 1982 Amendment to § 766(h) reveals a congressional intent to accord different treatment to proprietary accounts, such an intent is conspicuously absent from the legislative history of § 766(h) in the 1978 Code. Consequently, to infer legislative intent of a 1978 provision on the basis of the legislative history of the 1982 Amendment is to ask this Court to make such history retroactive. Since the consequences of enacting the 1982 Amendment drastically alters the status of customers who are also major shareholders of commodities futures merchants, and in the absence of an expressed contrary legislative intent in 1978, the presumption must be that the 1978 Code provision reflects the intent of the legislature at that time.

Moreover, in *United States v. Security Industrial Bank*, 459 U.S. 70, 81, 103 S.Ct. 407, 414, 74 L.Ed.2d 236 (1982) the Supreme Court reiterated a basic principle of statutory construction that "[n]o Bankruptcy law shall be construed to eliminate property rights which existed before the law was enacted in the absence of an explicit command from Congress." Accordingly, any property rights of customers in balances remaining in their trading accounts

which would be eliminated would violate this basic rule. Consequently, where the effect of giving priority status to some customers would deplete the assets available for distribution to other customers, clearly some customer's property rights would be eliminated. Because CDCB's liabilities were in excess of $4.7 million, the property rights of customers accorded lesser status would effectively be extinguished. Consequently, this Court should not give retroactive effect to the 1982 Amendment if its application would effectively eliminate established property rights. Furthermore, while the degree of risk in commodities trading is admittedly high, to magnify that risk by changing the rules without giving participants an opportunity to evaluate new or added risks and act accordingly would be unjust.

Since § 766(h) of the 1978 Code expressly orders the Trustee to "distribute customer property ratably to customers" without according a lesser status to some customers, the Court should not give retroactive effect to the 1982 Amendment and thereby destroy those property rights present at the commencement of the case and before the enactment of the 1982 Amendment to § 766(h). Consequently, this Court will deny the Trustee's motion to subordinate the claims of Mrs. Tate and the Tate Trust to those claims of non-proprietary customer accounts.

An Order in conformity with this Memorandum Opinion will be entered.

## ON MOTION FOR RECONSIDERATION

This matter is before the Court on the Trustee's motion for reconsideration of that portion of the Court's July 12, 1985 order which denied the Trustee's motion for summary judgment as to Alice C. Tate's claim for the positive balance in account nos. 0074, 0075, and 0076. The Trustee sought the disallowance or subordination of the claims of Alice C. Tate arising from certain of her accounts with the debtor which are designated as proprietary. The foregoing order was entered pursuant to the Court's June 27, 1985 memorandum opinion which sets forth in detail the facts of this case.

The Court has determined that this bankruptcy proceeding is governed by § 766(h) of the Bankruptcy Reform Act of 1978 ("Bankruptcy Code") as it existed prior to the 1982 amendment. (11 U.S.C. 766(h)). Section 766(h) as amended now requires the subordination of claims of proprietary accounts to those claims of public account customers. The Trustee asserts that Section 6d(2) of the Commodity Exchange Act which requires the segregation of proprietary funds applies to the debtor's proprietary customers and obtains the same result as amended § 766(h). The parties agree that Mrs. Tate's proprietary accounts were not segregated by the debtor. Therefore, the Trustee argues that Mrs. Tate's claims should be subordinated. The Court disagreed in its July 12, 1985 memorandum opinion and held that Mrs. Tate's claim should be treated like other customer claims.

The substance of the Trustee's motion for reconsideration is that the Commodity Exchange Act and rules and regulations of the Commodity Future Trading Commission defining customer property and relating to proprietary accounts are binding on this Court and govern these Bankruptcy proceedings even though the provisions of the Bankruptcy Code may be inconsistent with or contrary to those regulations. According to the Trustee, Congress explicitly delegated general rulemaking authority to the Commodity Future Trading Commission, and that authority included the right to define the term "customer property". The Commission having acted, the adopted definitions are binding upon this Court. The effect of this position is that the 1982 amendment to § 766(h) of the Bankruptcy Code would be essentially a non act.[1]

---

1. The Court finds further support for this position in the 1978 Amendment to 28 U.S.C. § 2075. Pub.L. 95–598 substituted "in cases un-

der Title 11" for "under the Bankruptcy Act" and struck out provisions directing that all laws in conflict with bankruptcy rules be of no fur-

Prior to 1982, § 766(h) of the Bankruptcy Code required that claims arising from both proprietary accounts and customer accounts receive ratable distributions from available funds. Section 6d 2 of the Commodity Exchange Act by itself does not mandate the subordination of unsegregated proprietary account claims to the claims of segregated account customers. Nor can the Commodity Exchange Act and the Commodity Future Trading Commission determine the priority of bankruptcy claims. Furthermore, the 1982 amendment requiring the subordination of claims of proprietary accounts cannot be applied retroactively to this bankruptcy proceeding which was commenced in 1980.

The Court stands by its Order of July 12, 1985. However, Mrs. Tate's claims must be paid from the proper funds.

■ The Court in its memorandum of November 15, 1985 requested information regarding funds to be used for the payment of the customer accounts. The question is whether the funds distributed and to be distributed to proprietary customers come from the liquidation of assets which were in segregated customer accounts or belonged in segregated accounts. The Court is of the opinion that it would be unfair and unlawful to use funds generated by such segregated customer accounts to pay those claims arising from nonsegregated proprietary accounts such as Mrs. Tate's claims.

Defendant stated that the Court's inquiries are not relevant to or dispositive of the merits of the Trustee's pending motion to reconsider the Court's memorandum opinion and order. The Court disagrees with counsel for the defendant. Not only would it be improper to pay claims for proprietary accounts from funds generated from the disposition of public customers' assets; it would also be unfair to Mrs. Tate individually and as trustee of the Tate Trust account to subordinate her claims in such a manner that she has no right to payment from unsegregated funds.

The Trustee's affidavit is clear, precise and responds to the questions raised by the Court. Funds in the house account not directly traceable to public customer assets shall be used to pay Mrs. Tate's claims ratably with all other claims against that fund, including public customer claims not paid out of the public customer fund. For example, if public customer claims total $10,000,000 and there is $5,000,000 in public funds available for distribution, there would be a $5,000,000 balance due public customers which would be paid out of the house account pro rata with Mrs. Tate's and other like claims.

Paragraph 7 of the order of July 12, 1985 as modified by the minute order of July 30, 1985 will be further modified in accordance with the provisions of this supplemental memorandum.

The Trustee is directed to submit an order in open Court consistent with this memorandum on January 30, 1986 at 10:30 a.m. on two days notice to the defendant.

ther force or effect after such rules have taken effect. 28 U.S.C.A. § 2075, Historical Note at 102 (West 1982). *See also* H.R.Rep. No. 595, 95th Congress, 1st Sess. 292–93 (1977), *reprinted in* [1978] U.S.Code Cong. & Ad News, 5963, 6249–50.