**NEWMAN–GREEN, INC.,**
**Plaintiff–Appellant,**

v.

**Alejandro ALFONZO–LARRAIN R., et al., Defendants–Appellees.**

**No. 87–1195.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 14, 1987.
Decided Oct. 28, 1987.

Rowe W. Snider, Lord, Bissel & Brook, Chicago, Ill., for plaintiff-appellant.

Charles G. Albert, Bell, Boyd & Lloyd, Chicago, Ill., for defendants-appellees.

Before FLAUM, EASTERBROOK, and KANNE, Circuit Judges.

EASTERBROOK, Circuit Judge.

Newman–Green, Inc., a manufacturer of aerosol valves, licensed Newman–Green de Venezuela (NGV) to use its trademarks and trade secrets in Venezuela in exchange for a 5% royalty on net sales. Newman–Green (NGI) owns 25% of NGV's stock; four Venezuelans and one U.S. citizen living in Caracas own the rest. Several of these are the principal managers of NGV. The five signed a guaranty, the core of which provides:

> In consideration for the execution of the license agreement dated June 13, 1974 from [NGI] to [NGV], the undersigned personally, individually and/or collectively agree that they guarantee the payment to [NGI] of an amount of money up to the 5% royalty set forth in the license agreement and for the period of time specified in the license agreement.

NGV made and sold valves using NGI's technology between 1975 and 1980 but has not paid NGI a penny. One reason was a decision by an agency of the Venezuelan government that 5% was excessive. The license allowed NGI to call off the deal in such an event, and the guaranty was a hedge against the possibility that Venezuela might not approve the license.

When NGI gave notice of termination in light of the decree, NGV made and sold the valves for more than eight months beyond the time allowed by the contract. When NGV stopped, a new firm, Venvalvex, started making valves. NGI believes (with some evidentiary support) that the guarantors organized Venvalvex and transferred NGI's technology to it; we must assume that NGI could prove this at a trial.

NGI is an Illinois corporation, and the guarantors consented to suit in Illinois (and under its law). NGI filed this action against NGV and the five guarantors, relying on the mixed alien-diversity jurisdiction established by 28 U.S.C. § 1332(a)(3). The suit has many separate claims for relief, some of which are before us on a separate judgment under Fed.R.Civ.P. 54(b). The district court wrapped up all segments of the litigation involving the guarantors and

properly entered the judgment under the "separate party" provision of Rule 54(b).

NGI received summary judgment against the guarantors for the more than $200,000 in royalties NGV owed through November 1, 1979, the final termination date NGI fixed.[1] The guarantors won summary judgment on two other claims: for royalties on sales NGV made until July 1980, when it became quiescent, and for royalties on Venvalvex's sales since then. The district court held that the guarantors stand behind NGV's debts, not Venvalvex's; and of NGV's debts, the guarantors are responsible only for "royalties". The district court concluded that sums due for valves sold after November 1 are "damages" rather than "royalties" and therefore are not covered by the guaranty. The guarantors have not appealed from the judgment representing royalties through November 1, 1979, and NGI has not appealed from the dismissal of certain claims against NGV itself. (The district court concluded that it lacked personal jurisdiction over NGV with respect to tort claims.) So we need consider only the award of summary judgment against NGI's claims for compensation from the guarantors on sales of valves after November 1, 1979.

## I

The guarantors simplified the case further by conceding at oral argument that if Venvalvex is the alter ego of NGV, a mere continuation of that firm's business after squeezing out NGI, then their liability on the Venvalvex sales stands or falls with their liability on the sales between November 1979 and July 1980. The concession was well advised in light of *United States Shoe Corp. v. Hackett*, 793 F.2d 161 (7th Cir.1986), which, although decided under Wisconsin law, states principles of more general applicability. If Venvalvex is a genuinely new firm, deriving its technology from an independent source, then as the district court correctly held the guarantors are not liable, even if they are its managers

and principal investors. The guarantors' participation in an independent venture might be tortious, but the guaranty does not cover torts. The case was resolved on summary judgment, yet it is a question of fact whether Venvalvex is a "successor" to NGV. If Venvalvex is NGV's successor, it stands in NGV's shoes, and the guarantors—alleged to have arranged the substitution of Venvalvex for NGV—could not improve their position by shuffling corporate papers. The successorship question must be tried, *if* the guarantors are liable for NGV's sales after November 1, 1979.

## II

There is an obstacle to reaching this issue, however: subject matter jurisdiction. We haven't any. NGI sued NGV and four Venezuelans. Jurisdiction for a suit between a U.S. citizen and aliens is available under 28 U.S.C. § 1332(a)(2). But NGI also sued William L. Bettison, the fifth guarantor. The complaint alleges, and the parties agree, that Bettison is a citizen of the United States who has lived in Caracas for more than a decade; it is a fair inference that Bettison is domiciled in Caracas, and no one contends that Bettison is domiciled in any state. NGI therefore invoked 28 U.S.C. § 1332(a)(3), which supplies jurisdiction of suits among "citizens of different States and in which citizens or subjects of a foreign state are additional parties". The difficulty is that Bettison, an expatriate, is not a "citizen" of any state; one must be domiciled in a state to be its citizen. So far as the diversity jurisdiction is concerned, Bettison is "stateless". *Sadat v. Mertes*, 615 F.2d 1176, 1180 (7th Cir.1980). He also is not an alien. So § 1332(a)(3) does not afford jurisdiction, and there is no other source. See Charles Alan Wright, Arthur Miller & Edward Cooper, 13B *Federal Practice and Procedure* § 3621 (2d ed. 1984). Cf. David P. Currie, *The Federal Courts and the American Law Institute*, 36 U.Chi.L.Rev. 1, 9–10 (1968) (suggesting that Congress do something about the

---

1. We need not recount the skirmishing about conversion between Venezuelan bolivares and U.S. dollars that occupied much of the district

court's time. See 612 F.Supp. 1434 (N.D.Ill. 1985). Some earlier opinions appear at 605 F.Supp. 793 (1985) and 590 F.Supp. 1083 (1984).

problem, perhaps treating expatriates as foreign nationals). The "complete diversity" rule of *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806), requires us to dismiss the whole case.

■ Unless NGI cures the problem by dismissing Bettison as a party. We invited such a solution, and NGI has filed the necessary motion. See 28 U.S.C. § 1653; Fed.R.Civ.P. 21. A court "may dismiss a nondiverse party in order to achieve diversity even after judgment has been entered." *Publicker Industries, Inc. v. Roman Ceramics Corp.*, 603 F.2d 1065, 1069 (3d Cir.1979). See also, e.g., *Caspary v. Louisiana Land & Exploration Co.*, 725 F.2d 189, 191–92 (2d Cir.1984); J. Wm. Moore & Jo Desha Lucas, 3A *Moore's Federal Practice* ¶ 21.03[2] at 21–10 (1986 rev.).

The guarantors oppose the motion, citing *Kanzelberger v. Kanzelberger*, 782 F.2d 774, 778–79 (7th Cir.1986). We held in *Kanzelberger* that a plaintiff could not drop a party on appeal to preserve jurisdiction, when that party's presence in the district court conferred a tactical advantage that may have contributed to the judgment. A court ought not allow a dismissal that injures adverse parties unduly, compared with the position the plaintiff could have achieved by suing the right parties in the first place. The guarantors other than Bettison may be injured in fact by Bettison's dismissal: they must pay the $200,000 (plus interest) for the pre-November 1979 sales without Bettison's help, and they are exposed to liability for other sales. We gather from NGI's representations at oral argument that Bettison has property in the United States on which NGI may have planned to levy. This is not, however, the sense of prejudice that matters. The guarantors are jointly and severally liable, so none is an indispensable party under Fed.R.Civ.P. 19(b). See *Bio–Analytical Services, Inc. v. Edgewater Hospital, Inc.*, 565 F.2d 450, 452–53 (7th Cir.1977); *Jett v.*

*Philips & Associates*, 439 F.2d 987, 996 (10th Cir.1971). NGI could have sued only the four Venezuelan guarantors in the first place, putting them in the same position they will occupy once NGI dismisses Bettison. Bettison's presence in the district court did not affect the conduct of the litigation.

The only apparent prejudice is to Bettison, who has participated in this litigation and faces the prospect of a second suit in state court. Had NGI filed this case in the courts of Illinois or Venezuela, or sued Bettison in one court while pursuing the Venezuelan guarantors in another, his liability would have been finally determined in a single litigation. NGI's carelessness about federal jurisdiction is responsible for this problem, so although we grant NGI's motion to dismiss Bettison, we dismiss him with prejudice. The other guarantors may pursue Bettison to obtain contribution or indemnity, if they are entitled to any. Section 1653 provides that "[d]efective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts." Those are our terms.

### III

· The district court absolved the guarantors of liability for valves sold after November 1, 1979, because the guaranty covered "royalties" but not "damages"; sums due because of NGV's breach of contract are damages, the district court held. The guaranty is not expressly so limited. It speaks of "a sum of money up to the 5% royalty", and NGI says that this language—designed to sidestep Venezuelan rules that could curtail the payment of "royalties"—also sidesteps the recharacterization of the money as "damages". This is a plausible argument, but we do not reach it. We may assume, with the district court, that ambiguities in the guaranty should be resolved in the guarantors' favor.[2] *Telegraph Savings & Loan Ass'n v.*

2. This hoary maxim is not simply a rule of preference for obligors. Guaranties are important commercial instruments, whose utility would be seriously undermined if, as some language in the district court's opinion suggests, courts should go out of their way to find reasons to absolve guarantors. See *First Wisconsin Financial Corp. v. Yamaguchi*, 812 F.2d 370, 373 (7th Cir.1987). The rule of construction nonetheless has some function. It gives parties a

*Guaranty Bank & Trust Co.*, 67 Ill.App.3d 790, 794, 24 Ill.Dec. 330, 333, 385 N.E.2d 97, 100 (1st Dist.1979). This does not matter if the sums are called "royalties", as we think Illinois law requires.

■ "Royalties" is the term conventionally applied to periodic or sale-based payments for the use of intellectual property. Intellectual property may be used with or without consent. If NGV and the guarantors had stolen the plans for aerosol valves from NGI's offices, they would be liable in "damages", perhaps punitive damages plus compensatory damages equal to their profits or, alternatively, measured by reasonable royalties. *Goldberg v. Medtronics, Inc.*, 686 F.2d 1219, 1228–29 (7th Cir.1982) (Illinois law). But NGV did not steal the plans. It simply used the technology longer than it was supposed to. Illinois courts have repeatedly characterized payments by the licensees in such circumstances as "royalties". E.g., *Warth v. Loewenstein & Sons*, 219 Ill. 222, 223–24, 76 N.E. 379, 380 (1905) (affirming without comment a requirement that the licensee pay "royalties" after termination until it returned the patented machinery); *Laff v. John O. Butler Co.*, 64 Ill.App.3d 603, 617, 21 Ill.Dec. 314, 323–24, 381 N.E.2d 423, 432–33 (1st Dist. 1978). The parties, who agreed that their deal would be interpreted under Illinois law, must take its characterization of royalties with the other applicable rules. We have used the same terminology, calling the payments by an overstaying licensee "royalties". E.g., *Beckman Instruments, Inc. v. Technical Development Corp.*, 730 F.2d 1076, 1079 (7th Cir.1984) (dictum); *Kraly v. National Distillers & Chemical Corp.*, 502 F.2d 1366, 1372 (7th Cir.1974); *Heath v. A.B. Dick Co.*, 253 F.2d 30, 34–35 (7th Cir.1958). On the reasoning of these cases, the contractual obligation to pay "royalties" survives as long as the licensee uses the intellectual property.[3]

This usage makes sense, in general and as applied to a case like ours. Licensees of intellectual property have substantial control over compliance with their obligations. The intellectual property is intangible; the owner can't drop by and scoop it up. The opportunity to use the knowledge without paying is inviting, the gains great, detection difficult. If the very fact of opportunistic conduct also cut off an important remedy of the licensor, it would be harder to engage in licensing and everyone would lose.

This case offers an illustration. We must assume, given the posture of the litigation, that the guarantors had operational control of NGV and decided to go on making and selling the valves after the termination date. It would be extraordinary if the guaranty allowed their conduct as corporate managers to extinguish their liability as guarantors. Only a fool would negotiate for such a result, and we do not perceive NGI as dense. The license agreement allowed either side to terminate in certain circumstances. The guarantors' position implies that if they had caused NGV to send NGI a notice of termination, and thereafter had gone on making and selling valves, they would have eliminated their exposure under the guaranty. That cannot be right. Courts try to understand and interpret loose language in contracts (including guaranties) so that it means what the parties would have provided if they had thought about the problem expressly and spelled out their conclusions fully. *Morin Building Products Co. v. Baystone Construction, Inc.*, 717 F.2d 413, 415 (7th Cir.

ready way to choose among degrees of commitment. By posting a letter of credit or a bond, the parties may make the obligation almost iron-clad; by obtaining insurance they may choose a middle ground; and by writing a guaranty they select the least security of the corporation's debt. Standby letters of credit are common in transactions of the sort in which NGI and NGV engaged. NGI did not obtain a letter of credit and cannot now demand the degree of certainty a letter would have provided.

**3.** But for the license agreement, Illinois might cut off NGV's obligation after the period in which it could have engaged in legitimate reverse engineering. *Brunswick Corp. v. Outboard Marine Corp.*, 79 Ill.2d 475, 38 Ill.Dec. 781, 404 N.E.2d 205 (1980); cf. *Syntex Ophthalmics, Inc. v. Tsuetaki*, 701 F.2d 677, 683 (7th Cir.1983) (Illinois law). The guarantors do not say that the license's royalty obligation may be extinguished by the possibility of reverse engineering.

1983); *Argonaut Insurance Co. v. Town of Cloverdale,* 699 F.2d 417, 420 (7th Cir. 1983); *United Airlines, Inc. v. City of Chicago,* 116 Ill.2d 311, 318, 107 Ill.Dec. 705, 708, 507 N.E.2d 858, 861 (1987); Oliver Wendell Holmes, *The Common Law* 303 (1881). We do not suppose for a second that if the guarantors had proposed the clause—"In the event we terminate or breach the license contract we are thereafter not liable under the guaranty contract"—NGI would have done anything but huff out of the room and look for honest trading partners. Yet this parody of a contractual provision is exactly what the guarantors have argued their contract means.

The license and guaranty contracts are consistent with this reading of the obligation to pay "royalties" automatically supplied (as a ready-made term) by Illinois law. Section III of the license provides that all "terms" of the agreement remain in force until 1994 "unless sooner terminated as hereinafter provided." And the termination provisions "hereinafter provided" refer to more than the *notice* of termination; they also require NGV to cease making valves and return the technology, and they set a time limit on the sale of valves from NGV's inventory. These contractual terms survive the giving of the notice of termination. *Illinois Bell Telephone Co. v. Reuben H. Donnelley Corp.,* 595 F.Supp. 1192, 1197 (N.D.Ill.1984). Cf. *Saturday Evening Post Co. v. Rumbleseat Press, Inc.,* 816 F.2d 1191, 1196 (7th Cir. 1987) (other obligations in an intellectual property license also survive the notice of termination); *My Pie International, Inc. v. Debould, Inc.,* 687 F.2d 919, 921 (7th Cir. 1982). It is logical to treat the obligation to pay royalties as running with the sale of the valves; only when the termination has been completed (by the cessation of sales and the return of the equipment) does the contractual obligation to pay royalties cease. The guaranty itself requires the guarantors to pay "for the period of time specified in the license agreement". NGI says this means "until 1994 but not beyond"; NGV says this means "until the notice of termination"; perhaps it could mean "until termination has been completed in accord with the license". If the case turned strictly on the interpretation of these clauses, it probably would require a trial. E.g., *Rivan Die Mold Corp. v. Stewart-Warner Corp.,* 26 Ill.App.3d 637, 642, 325 N.E.2d 357, 361 (1st Dist.1975). But as we refer to the license and guaranty only to show that they are not inconsistent with the standing rule in Illinois—one applicable unless varied by contract—that the obligation to pay "royalties" follows the sale of the items, a trial is unnecessary.

The guarantors are required to compensate NGI for 5% of NGV's net sales of valves made with NGI's technology, for as long as NGV sells the valves (but no later than 1994), unless they have some additional defense that the district court did not discuss. We remand for a trial on the question whether Venvalvex is an alter ego of NGV. We dismiss Bettison as a party, with prejudice. The district court already has liquidated NGI's claim for the period November 1979–July 1980, so only the activities thereafter require further proceedings on either liability or damages, unless there are unadjudicated defenses. No costs.