ITT INDUSTRIAL CREDIT
COMPANY, Plaintiff,

v.

D.S. AMERICA, INC., Defendant.

No. 86 C 7446.

United States District Court,
N.D. Illinois, E.D.

Dec. 7, 1987.

Alexander Terras, Mark P. Cohen, Epton, Mullin & Druth, Ltd., Chicago, Ill., for plaintiff.

Gerald L. Morel, Nancy E. Sasamoto, Masuda, Funai, Eifert & Mitchell, Ltd., Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

ITT Industrial Credit Company ("ITT") sues D.S. America, Inc. ("D.S. America") to

enforce the parties' December 28, 1984 Recourse/Repurchase Agreement (the "Agreement"). As contemplated by the Agreement (though the parties dispute whether the financing transaction next referred to followed the proper form), ITT financed the purchase of printing equipment from D.S. America by Color Company ("ColorComp"). If the Agreement in fact applies, D.S. America is obligated to have provided recourse for ITT for a three-year period in case of ColorComp's default, an event that has come to pass.

Both ITT and D.S. America have moved under Fed.R.Civ.P. ("Rule") 56 for summary judgment on the one-count Complaint.[1] For the reasons stated in this memorandum opinion and order, both motions are denied.[2]

### Applicable Standards

Whenever cross-motions for summary judgment are involved, this Court must take a dual perspective: Each movant has the burden of establishing the absence of any genuine issue of material fact on its own motion (*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). To determine the existence of any material factual dispute, this Court must (on each motion) draw "only reasonable inferences, not every conceivable in-

ference," in favor of the nonmovant (*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326 (7th Cir.1987)). "Materiality" of a dispute depends on the fact being outcome-determinative (*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)):

> Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.

Once a movant has met its burden of showing no genuine issue, the nonmovant can then establish such an issue only through evidentiary submissions authorized by Rule 56, not merely by contrary allegations in its pleadings (*Celotex*, 106 S.Ct. at 2553).

■ As for the applicable law, this opinion will look to Illinois. That need not necessarily have been the case: Only D.S. America is Illinois-based, with ITT having its home office in Missouri and ColorComp being a Texas company. But both litigants have focused on Illinois law—and where (as here) the parties have failed to raise the choice of law issue and have treated the forum's substantive law as controlling, that is viewed as a stipulation as to the applicable law (*National Association of Sporting Goods Wholesalers, Inc. v. F.T.L. Marketing Corp.*, 779 F.2d 1281, 1284–85 (7th Cir. 1985)).[3]

---

1. As it frequently does on such cross-motions, this Court ordered simultaneous cross-filings by the parties, followed by simultaneous cross-responses. With leave of court, ITT then filed a third memorandum to address issues first raised in D.S. America's responsive memorandum. This opinion will cite the various memoranda by referring first to the litigant (in this instance as "ITT" or "DSA"), then to the memorandum involved ("I," "II" or "III"), then to the page—for example, "ITT Mem. II–7." Exhibits (other than those annexed to a particular deposition) will similarly be designated "ITT Ex.—" or "DSA Ex.—."

2. As this Court has observed on other occasions, the need to emulate Janus on Rule 56 cross-motions (as discussed below under "Applicable Standards") creates the potential that *neither* side will get summary judgment. One way for the trial judge to avoid that waste of lawyers' time, clients' money and judicial effort is to try to get a stipulation up front that any factual issues that do emerge from the opposing presentations may be resolved by the judge. Another

and riskier possibility is that a creative appellate court will infer such an agreement from the mere presentation of cross-motions (see *May v. Evansville–Vanderburgh School Corp.*, 787 F.2d 1105, 1115–16 (7th Cir.1986))—a doubtful proposition in most cases. As the later discussion in this opinion reflects, this is one of the cases that falls between the cracks because of the double inference-drawing requirement referred to in the next paragraph in the text. In any event, this opinion's "Facts" recital is drawn from both parties' submissions, while the disputed item that forecloses summary judgment is referred to later in the body of the opinion.

3. This Court's independent analysis has confirmed the reasonable likelihood that Illinois choice-of-law rules would lead to Illinois substantive law. Illinois now employs the "most significant contacts" approach for contract as well as tort actions (*Palmer v. Beverly Enterprises*, 823 F.2d 1105, 1107 (7th Cir.1987)). Several of the relevant factors—mainly D.S. America's principal place of business and the place of contracting—point to Illinois (see *Champagnie*

*Facts*

In 1984 D.S. America, a supplier of lithographic and electronic arts equipment, agreed to sell one of its Model SG–818 Dot Scanners to printing company ColorComp. ColorComp needed financing, so D.S. America referred it to ITT, a commercial finance company, and negotiations ensued.

As a condition of its providing financing, ITT asked D.S. America to underwrite a three-year period of ColorComp's payments if the latter defaulted on its obligations (ITT had originally wanted recourse rights for the full term of ColorComp's obligation —five years—but settled for a shorter term). ITT sent D.S. America the one-page letter-form Agreement, which was signed by D.S. America's Executive Vice President Yoshiaki Satoh ("Satoh") and then dated December 28, 1984, the same day ITT and Colorcomp executed the financing documents.

Under the ITT-drafted form Agreement, the underlying transaction was described as ITT's purchase of the equipment, followed by its lease to ColorComp. Its pertinent provisions (in fact, almost the entire document) read:

> In order to induce you [ITT] to purchase the equipment above described[4] and to enter into a Lease Agreement with respect to said equipment between you as Lessor and the above named Lessee [ColorComp], the undersigned [D.S. America] hereby agrees that in the event of any default of the Lease Agreement which shall include: failure by Lessee to make any scheduled rental payment to Lessor within thirty (30) days from the contractual due date, under said lease on the part of Lessee, the undersigned will upon your written request perform one of the following:

> 1) Purchase of all your interest in the said equipment and your rights as Lessor under the said lease at a price equal to the sum of the entire unpaid lease balance within 60 days of notice of default

> –OR–

> 2) Furnish to you a new Lessee who will assume responsibility for the remaining rental payments. Said Lessee will be acceptable only at your own sole discretion. Furthermore, all necessary information on said Lessee will be provided to you within 45 days of notice of default. In the event Lessor accepts and acknowledges this new Lessee, all conditions of the initial lease will remain in full force and effect including the recourse provision.

> In the event of purchase by us under this agreement the purchase price shall be payable to you in cash upon demand by you and you shall not be required to take possession of the equipment from the Lessee or to deliver the same to the undersigned. Upon payment of the purchase price, the undersigned will, at its own expense, take possession of the said equipment wherever the same may be and it is understood that you shall make NO WARRANTY OR GUARANTY of any kind or nature whatever respecting the condition of said equipment or the state of title thereto.

> This Agreement shall commence 12–28, 1984 and be in force for a period of three (3) years.

■ However, the transaction between ITT and ColorComp was not structured as a lease. Instead ColorComp bought the equipment from D.S. America with funds borrowed from ITT, signing an Installment Note and Security Agreement. Rather

---

*v. W.E. O'Neil Construction Co.,* 77 Ill.App.3d 136, 144–45, 32 Ill.Dec. 609, 615, 395 N.E.2d 990, 996 (1st Dist.1979)).

**4.** [Footnote by this Court] "Above described" was a reference to a schedule to be attached to the Agreement. Satoh Dep. 46–47 reflected his belief the schedule was not so attached ("I don't think so"). Perhaps with that omission in mind, D.S. America's First Amended Answer raised the defense that the Agreement is "incomplete as to a material term ... [thereby failing] to state a claim upon which relief can be granted." But D.S. America has not raised that issue in the pending motions (which both parties intended to be fully dispositive of this lawsuit), and it is therefore waived. In any event, it would not appear to have been material to resolution of the case.

than being a titleholder-lessor, then, ITT was a direct lender with a security interest in the collateral—the Scanner and its accessories (Albert Kopczenski ["Kopczenski"] Dep. Exs. 4, 5). ITT also received personal guaranties on the note from ColorComp owners Gerald and Miriam Fields (collectively "Fields") (Kopczenski Dep. Ex. 6). Satoh Aff. ¶ 7 says D.S. America was not told ITT and ColorComp had entered into the installment loan and security arrangement instead of a finance lease.[5]

ITT filed UCC financing statements with the State of Texas in December 1984 and with Harris County, Texas on January 21, 1985 (Kopczenski Dep. Ex. 23). Those statements did not describe the Dot Scanner with precision, instead listing numerous pieces of equipment supplied to ColorComp that constitute either components of the Scanner or accessories to the main piece of equipment, the Scanner itself (Joseph Semeraro ["Semeraro"] Dep. 43).

In August 1985 ITT notified D.S. America that ColorComp was in default of its obligations.[6] D.S. America asked for copies of the ITT–ColorComp documentation—assertedly expecting to receive lease transaction documents.[7] Kopczenski sent D.S. America's attorney Colin Hara ("Hara") a set of papers including the Installment Note, the Security Agreement and the UCC filings (Kopczenski Dep. Exs. 12, 23).[8]

---

**5.** That assertion poses some obvious credibility problems. Satoh was experienced in financing transactions, and he was well aware both of the technical differences and of any claimed substantive distinctions between equipment financing leases and loans secured by the purchased equipment. In terms of the techniques employed, certainly the most obvious difference is that in the lease arrangement the finance company buys the equipment, then leases it to the user, while in the secured loan arrangement the user buys the equipment, then grants a security interest to the finance company. In this instance:

    1. D.S. America's Purchase Agreement form (dated November 16, 1984—before the ITT deal was negotiated) showed ColorComp as "Buyer/Debtor" and D.S. America as "Seller/Secured Party" (Satoh signed for it in that latter capacity).

    2. Satoh's November 30, 1984 letter forwarding the signed Recourse/Repurchase Agreement to ITT *after* the latter's deal with ColorComp had been struck spoke of "The Color Company *purchase* of DS equipment" (emphasis added).

    3. D.S. America's December 21, 1984 invoice for the equipment read "Sold to The Color Company"—*not* to ITT.

From the documents furnished this Court, then, it appears DSA Mem. II-7 paints a false picture when it says (emphasis added):

*Plaintiff* [ITT] conveyed the equipment to the Color Company and accepted a promissory note and security agreement.

All the documents referred to in this footnote, consistent with a secured loan and not with a finance lease, cast serious doubt on Satoh's current version of what he knew at the outset. D.S. America *had* to know ITT never took title to the equipment, as it would have had to do to become lessor under a finance lease. In that respect, the parties have not seen fit to provide this Court with all the corresponding documentation through which ITT did a straight equipment lease deal with another customer of D.S. America (Colorgraphics, Inc.) earlier in 1984. In any event, because questioning Satoh's affidavit would create a clear factual issue barring summary judgment, this opinion's analysis will be based on an arguendo acceptance of what Satoh says.

**6.** D.S. America disputes the exact timing of that notification, specifically whether ITT made demand for recourse before or after D.S. America was notified ColorComp was "on the verge of bankruptcy" (DSA Mem. II-2). But D.S. America certainly received notice of the default and demand for recourse at least by the time of the August 21, 1985 letter from ITT's Division Portfolio Manager Kopczenski to D.S. America's National Credit Manager Earl Mortimer ("Mortimer") (Kopczenski Dep. Ex. 11). D.S. America did not formally respond to that demand until October 2, 1985. It is really immaterial whether ITT's demand for recourse preceded or followed notice of ColorComp's financial difficulties (which came via telephone by an attorney for ColorComp on August 19).

**7.** As n. 5 has explained, D.S. America has clearly said it thought ITT and ColorComp would be executing a lease, while ITT disputes whether D.S. America believed before executing the Agreement that the transaction was to be structured as a lease. But for purposes of these motions ITT has said it is willing to accept D.S. America's version of the facts (ITT Mem. I-5 n. 2). For the reason stated in n. 5, this Court has done the same for the present—but see the caveat as to D.S. America's Rule 11 exposure expressed later in the opinion.

**8.** About that time Kopczenski placed the notation "Satisfied and Released" on the original counterpart of the Agreement, in the belief D.S. America was about to forward the necessary funds (Kopczenski Dep. 85-88). When the controversy over the Agreement later erupted, Kop-

D.S. America's response (an October 2 letter from Hara, Kopczenski Dep. Ex. 21) was a refusal to provide recourse per the Agreement because (1) no lease existed between ITT and ColorComp and (2) ITT's UCC filings had failed to secure the Scanner.

Negotiations then ensued between ITT and ColorComp to modify the installment note payment schedule. On November 18, 1985 an extension agreement was signed that (1) suspended payments on the note until April 1986, (2) pushed back the note's due date from December 1989 to October 1990 and (3) called for an extension fee of $26,507 payable in four installments, apparently as interest for the period for which principal payments were suspended (Kopczenski Dep. Ex. 14). That extension was agreed to by Fields, but D.S. America was not asked to consent. As part of the extension ColorComp agreed to a revised UCC filing to make ITT's security interest in the Scanner "clearer" (Kopczenski Dep. 63–64). That revision, which expressly identified the Scanner by its serial number and thus cured the original flaw (Kopczenski Dep. Ex. 18), was filed November 20, 1985.

In 1986 ColorComp again went into default on its payments to ITT. ITT's July 18, 1986 letter to D.S. America again called on the latter to provide recourse under the Agreement (ITT Ex. 7). D.S. America replied on July 22 (id.) by simply referring ITT to its earlier refusal ("The letter of October 2, 1985 addressed to Al Kopczenski ... explains our position in this matter"). ITT then negotiated a second extension with ColorComp, which was signed and agreed to by Fields on July 29, 1986 (Kopczenski Dep. Ex. 16). Under that agreement the payments on the note were lowered by something less than 40% for one year, to be increased thereafter to an amount slightly greater than the original monthly payments, while the ultimate due date was pushed back approximately three months. Again D.S. America was not

asked to approve the revision (Mortimer Aff. ¶¶ 4–5).

It turned out that ColorComp was beyond saving. It quickly failed to meet its revised obligations to ITT and went into default once more. It filed for Chapter 11 Bankruptcy Code protection September 26, 1986 (ITT Ex. 8). ITT brought this action October 1, 1986.

### Parties' Contentions

Resolution of the current motions turns on three arguments advanced by D.S. America:

1. ITT, by not entering into a lease with ColorComp, failed to satisfy a condition precedent to D.S. America's performance under the Agreement.

2. D.S. America's obligation under the Agreement was released by the two extensions of the installment note granted ColorComp without D.S. America's consent.

3. D.S. America's obligation was released by ITT's failure to perfect a security interest in the Dot Scanner, the principal piece of collateral for the transaction.

ITT responds (1) it has satisfied any condition precedent to the Agreement by entering into the Installment Note–Security Agreement transaction with ColorComp, (2) D.S. America is estopped by its own refusal to honor the Agreement from objecting to any later alteration in the original transaction between ITT and ColorComp and (3) ITT has filed adequate financing statements to meet its obligation—if any—to secure the collateral. This opinion addresses the three issues in a somewhat different order.[9]

### Lease as Condition Precedent

D.S. America's argument (DSA Mem. I 4–10) is quite straightforward. Under the Agreement, ITT was required to lease the

---

czenski rued his earlier optimism and added "marked paid in error A.J. Kopczenski 11/18/85" to the Agreement.

9. As will be seen, part of the discussion of the impairment-of-collateral issue is an appropriate prerequisite to dealing with the extensions of the note.

Dot Scanner to ColorComp. No other form of transaction was acceptable. Having failed to satisfy that condition precedent, ITT cannot require D.S. America to perform under the Agreement. To that end D.S. America cites a great deal of black letter law to the effect that a court must enforce the express terms of an unambiguous contract.

There is no disputing the fact that the one-page Agreement contemplated the transaction between ITT and ColorComp would be a lease. It spoke exclusively in terms of "Lease Agreement," "Lessor," "Lessee," "rental payment" and "lease." And of course there is no gainsaying that the actual ITT–ColorComp documentation took a different form.[10]

But that is the beginning rather than the end of the story. Illinois law looks in this kind of situation not solely to the precise terms of the document (even in the ordinarily-strict matrix of defining a guarantor's obligation[11]), but rather to whether the complaining party—the guarantor—has received the true functional equivalent of what the document specifies. *Claude Southern Corp. v. Henry's Drive-in, Inc.,* 51 Ill.App.2d 289, 201 N.E.2d 127 (1st Dist. 1964), *leave to appeal denied,* 31 Ill.2d 629 (1965) held a guarantor liable even though the principals executed a lease with a nominal purchase option rather than a conditional sale as the guarantor had expected (*id.* 51 Ill.App.2d at 300–02, 201 N.E.2d at 133). What controlled the court's decision was that the variation in the nature of the documentation was found nonmaterial and that "the parties received exactly what had been bargained for" (*id.*). Equally importantly, *Claude Southern, id.* at 300, 201 N.E.2d at 132 (emphasis added) made it plain that where the parties' intention was at issue (as well as in the more obvious situation of documentary ambiguity), equity courts would look to such functional equivalence rather than resorting woodenly to the pro-guarantor strict construction rule:[12]

> But where as here the express terms of the contracts are ambiguous, *or there is a question regarding the intention of the parties,* the rule of strict construction is not brought into play until the intention is determined from the declarations and conduct of the parties or from the surrounding circumstances.

No other reported Illinois case has dealt with a situation directly tracking this one (as contrasted with cases treating guaran-

---

**10.** This is the archetype of the needless and wasteful lawsuit. There was certainly no need for the documentation to have taken the form it did: As this opinion reflects, ITT had available (and in fact had used in other deals) finance lease forms, and there is not the slightest substantive difference in the rights and obligations under the two different forms of financing arrangements—ITT gained no edge by using the secured loan format. Had the lease arrangement been followed instead, this dispute would never have erupted. Though speculation is idle, it seems likely that some ITT functionary (perhaps even a lawyer, unfortunately) unthinkingly pulled the wrong set of forms for use. But as the ensuing discussion reflects, that "crime" does not necessarily call for the death penalty.

**11.** Both litigants' memoranda have cited primarily to cases involving guaranties. And D.S. America's undertaking certainly fits the conventional definition as expressed, for example, in *Rock Island Bank and Trust Co. v. Stauduhar,* 59 Ill.App.3d 892, 900–01, 17 Ill.Dec. 99, 105, 375 N.E.2d 1383, 1389 (3d Dist.1978):

> A guaranty contract is defined as an enforceable undertaking or promise on the part of one person which is collateral to a primary or principal obligation on the part of another, and which binds the obligor to performance in the event of nonperformance by such other, the latter being bound to perform primarily.

**12.** It is true that *Claude Southern* also recognized it was interpreting a guaranty "drawn by businessmen without the aid of legal counsel" (*id.*) and the court ought to determine the intent of the parties rather than be governed by a "strict technical nicety" (*id.*). This Court may perhaps be dealing with more sophisticated business entities (though the departure between the one-page Agreement and the contemporaneously-prepared "implementing" documents does not bespeak much sophistication on the part of ITT's human beings, as contrasted with ITT's corporate entity, see n. 10). But what controls for present purposes are (1) the fact that *Claude Southern*'s language quoted in the text is not at all limited to the businessmen-drafted document and (2) *Claude Southern*'s unrestricted adoption, in a precisely parallel set of relationships, of an equitable rather than a strictly literal definition of the parties' rights and duties.

tor relationships in the general sense).[13] Moreover, *Claude Southern* is in the best equitable tradition that continues to inform the Illinois appellate courts whenever it is viewed as appropriate. Faithful to *Erie v. Tompkins* traditions, then, this Court will conduct the same kind of inquiry into the equivalence of what was actually done to "what had been bargained for."[14]

What was the bargained-for "Lease Agreement" (that was the term used in the Agreement)? There are three broad categories of leases in the world of commercial financing: operating leases, tax leases and finance leases (Kopczenski Dep. 10–13). In the simplest of terms, an operating lease is the short-term rental of equipment; a tax lease is an arrangement under which the finance company-lessor remains the owner of the equipment and derives any tax benefits such as depreciation; and a finance lease is one in which at the end of the lease term the lessee has the option to purchase the equipment for a nominal amount, generally $1 (*id.;* Mortimer Dep. 80–81). For obvious reasons, the purely nominal "purchase price" renders the finance lease the functional equivalent of a conditional sale of the equipment by lessor to lessee (see *In re Loop Hospital Partnership*, 35 B.R. 929, 933–34 (Bankr.N.D.Ill.1983)).

Clearly the type of ITT ColorComp lease called for by the Agreement was a finance lease. D.S. America has really not contested that (Satoh Dep. 47; Mortimer Dep. 80–81). Both parties also emphasize the earlier D.S. America–Colorgraphics–ITT transaction, in which D.S. America signed an identical recourse agreement and ITT and Colorgraphics entered into a five-year finance lease with a $1 purchase option (Satoh Dep. 26–29; Satoh Dep. Exs. 2, 3). This opinion proceeds from that really undisputed premise: Literally read, the Agreement looked to a similar finance lease transaction.

Finance leases and secured installment notes of the type at issue here are essentially identical in substance. Both are really loans of capital from a finance company to an equipment purchaser, with the lessor/creditor advancing the purchase price by paying the equipment seller and then recapturing the price (either with interest or with its economic equivalent in yield) from the lessee/debtor over a fixed period of time, at the end of which the lessor/creditor's security interest in the collateral is released to the lessee/debtor. It may be a slight oversimplification (or perhaps no oversimplification at all) to say, as has ITT, that the transactions are identical except for the language in the documents (Kopczenski Dep. 50). In any event, though, D.S. America has certainly not identified any meaningful difference. Were it able to do so, its guaranty obligation would be discharged (*Lawndale Steel Co. v. Appel*, 98 Ill.App.3d 167, 174–75, 53 Ill.Dec. 288, 294, 423 N.E.2d 957, 963 (2d Dist.1981)). However, all the evidence demonstrates there was no variation in D.S. America's obligations or rights between those contemplated by the Agreement and those prescribed by the actual documents.

D.S. America's obligations certainly remained the same. Under the Agreement it was committed upon ColorComp's default to purchase ITT's rights against Color-

---

**13.** In light of *Claude Southern* as a direct precedent, this opinion need not pause to distinguish (or apply) such more generalized propositions as the usual strict reading of guarantor undertakings (see, e.g., *Farmers State Bank v. Doering*, 80 Ill.App.3d 959, 961, 36 Ill.Dec. 285, 287, 400 N.E.2d 705, 707 (4th Dist.1980); but cf. *Newman–Green, Inc. v. Alfonzo–Larrain R.*, 832 F.2d 417, 420 & n. 2 (7th Cir.1987)) or as the contra proferentem approach to contract construction —a "rule of last resort" (*Lippo v. Mobil Oil Corp.*, 776 F.2d 706, 714 n. 15 (7th Cir.1985)). Indeed the last-quoted language from *Claude Southern* teaches such rules of construction must take a back seat to the search for intent.

**14.** Of course this Court is well aware that the relevant search is one for the parties' intention, and both the *Claude Southern* discussion and what follows in the text of this opinion reflect an effort to get at intent in the objective sense. This Court is equally well aware that Satoh's affidavit purports to state his subjective intent: his claimed unwillingness to have signed the Agreement had he known the ITT–ColorComp transaction was not in lease form. That statement's effect on the current ruling will be dealt with in due course.

Comp or to tender a new lessee subject to ITT's approval. Under the secured note transaction, those same obligations could be discharged by purchasing ITT's rights—in this instance, by paying off the balance of the note rather than the balance of the lease—or by tendering a new obligor on the note rather than a new lessee. Although D.S. America tries to paint the latter alternative (which necessarily presumes D.S. America's locating another user-customer for the ColorComp equipment) as nonequivalent, its excessively literal arguments are entirely nonpersuasive:

1. ITT would have to approve the new user's creditworthiness in any case (as the Agreement put it, "Said Lessee will be acceptable only at your [ITT's] sole discretion"). If ITT gave its approval for purposes of accepting that new user as a lessee, exactly the same business decision would surely make the new user an equally acceptable obligor on the secured note equivalent of the finance lease.

2. If (as D.S. America's makeweight argument suggests) the new user might prefer a lessee position for some reason, ITT's finance lease format would have been readily available for that purpose. Because ITT had the unfettered right to accept or reject the tendered new user, a decision to accept the latter as a borrower would necessarily implicate the same factors as the acceptance of the new user as lessee under a finance lease.

On the obverse side of the coin, D.S. America's rights also remained the same. Its Agreement obligations discussed in the preceding paragraph may be viewed as alternative rights: D.S. America's option to purchase ColorComp's obligation itself or to offer a new party to take possession of the equipment and assume ColorComp's duties. DSA Mem. II–6 contends it lost the right (a conditional one, it must be remembered) to re-lease the equipment because

the Security Agreement required the secured party to sell the collateral upon default. That, however, misreads the Security Agreement, which specifically says (DSA Mem. II Ex. 2, Additional Provision ¶ 4):

> Secured Party shall have all the rights and remedies granted to a Secured Party under the Uniform Commercial Code [UCC]....

Under UCC § 9–504 (emphasis added): [15]

> A secured party after default may sell, *lease* or otherwise dispose of any or all of the collateral....

Thus ITT, and D.S. America in its stead, would have had the right to lease the equipment to a new party (one acceptable to ITT) after ColorComp's default.

Apart from Satoh's ipse dixit statement as to the unacceptability of the Agreement to D.S. America without a lease (a subject still to be dealt with), D.S. America's efforts to discredit the secured loan transaction as nonequivalent are less than specious. Mortimer asserted there "could be a number of different ways" in which D.S. America's obligations might be affected by the restructured transaction, but he was unable to cite even a single example of any such effect—let alone any prejudicial effect (Mortimer Dep. 88–90). Satoh also said it was important to D.S. America that the ITT–ColorComp transaction be structured as a lease, explaining that its customers are mostly small companies without the capital to arrange their own financing (Satoh Dep. 33–34). That is a total non sequitur in terms of the present question: Satoh offers no explanation as to why a secured installment note with the same payment structure would make any difference whatever to a company with limited capital resources. Indeed, Satoh's point (if any) is vitiated by ColorComp's (as D.S. America's customer) having accepted that alternate type of transaction. Moreover, as already explained, the right was readily available to

---

**15.** Although the Security Agreement says it is to be "interpreted according to the laws of the state of Missouri," ITT's principal place of business, a choice-of-law question might perhaps be posed by the fact the financing statements necessarily had to be filed in Texas (ColorComp's home state). But because both Missouri and Texas (and Illinois, for that matter) have enacted the UCC, the choice of law makes no difference (see 9 Hawkland, Lord & Lewis, *UCC Series* § 9–504:02 (Art. 9)).

D.S. America, following a repurchase, to structure any subsequent transaction involving the equipment as a lease.

In sum, nothing in D.S. America's presentation, except for Satoh's bald assertion of unacceptability, takes this case out of the *Claude Southern* conclusion that D.S. America "received exactly what had been bargained for." Nor, except for that same bald assertion, do any *reasonable* and favorable inferences create a genuine issue of material fact to render the *Claude Southern* rule of law inapplicable. Were it not for Satoh's statement, then, *Claude Southern* would mandate this Court to conclude as a matter of law that ITT did fulfill any condition precedent to the Agreement by executing the Installment Note and Security Agreement with ColorComp.

All the foregoing discussion has spoken in objective-intent terms: what kinds of rights and duties "had been bargained for" when D.S. America signed the Agreement. But Satoh Aff. ¶ 9 says otherwise in purely subjective terms:

> D.S. America would not have signed the Recourse/Repurchase Agreement if it had been told that there was no lease between ITT and The Color Company.

ITT Mem. II–3 n. 3 urges that statement is carefully couched to avoid saying D.S. America would have refused to sign the Agreement if it knew the transaction was going to be written in secured installment note form. And whether or not that is so, Satoh's affidavit must be viewed as suspect. After all, ITT's commitment enabled D.S. America to sell more than $250,000 worth of its product. Is Satoh really saying D.S. America would have foregone that kind of sale, with its undoubted profit component, because of some fancied distinction between the finance lease and the secured note documentation?

Nonetheless Satoh's assertion (however suspect) is enough to avert summary judgment. *Anderson*, 106 S.Ct. at 2511 reinforces the long-established principle "that at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Except in the truly extraordinary situation (*Mechmet v. Four Seasons Hotels, Ltd.*, 825 F.2d 1173, 1179 (7th Cir.1987)) Rule 56 motions may not be resolved on the basis of the court's determinations of credibility (as *Anderson*, 106 S.Ct. at 2513 put it, "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge ...").[16]

Thus the very existence of a fact issue forecloses summary judgment in favor of ITT. Of course it should be obvious D.S. America cannot prevail on *its* motion once reasonable inferences are drawn in ITT's favor. But consistently with the procedure encouraged (if not in fact mandated) by Rule 56(d), this opinion will go on to treat with the other issues disputed by the parties.

### Failure To Secure the Collateral

D.S. America also contends it should be released from any obligation under the Agreement by ITT's failure to file financing statements adequate to secure an interest in the Dot Scanner. ITT offers three responses:

> 1. It made no warranty as to title to the equipment (ITT Mem. III–4).

---

**16.** ITT may ultimately be able to prove that Satoh (and hence D.S. America) had no objective good faith predicate for making the statement that has blocked summary judgment—a real possibility in light of the objective identity of the finance lease and the secured installment note. ITT may even be able to prove Satoh (and hence D.S. America) had no objective good faith predicate for denying knowledge from the beginning that there was no lease arrangement—also a real possibility (see n. 5). However, ITT would not necessarily be without a remedy.

Rule 11 might well come into play to shift ITT's resulting expense (perhaps the cost of a trial) to D.S. America (see *Lisak v. Mercantile Bancorp, Inc.*, 834 F.2d 668, 672 (7th Cir.1987) for a strong directive from our Court of Appeals to district judges to give a "close look" to the potential of Rule 11 sanctions). Given those prospects, it might be appropriate at the time of trial to consider special interrogatories for the jury on the subject of D.S. America's intention and D.S. America's knowledge. That, however, is for the future.

2. In any event, the property description in the filings was adequate to perfect a security interest (*id.* at 5–6).

3. Even if that were not so, any initial defect in the security interest was cured by the second round of filings (*id.* at 6–7).

Two of those arguments are meritless, but the third succeeds.

One possible threshold problem—though mentioned by neither party—should be dispelled first. "Unjustifiable impairment of collateral" is normally a UCC concept, serving to discharge the obligations of a party holding an interest in that collateral (UCC § 3–606(1)(b)). Failure to file financing statements can cause the impairment of collateral triggering such a discharge (see *First Bank and Trust Co., Palatine v. Post,* 10 Ill.App.3d 127, 132, 293 N.E.2d 907, 910–11 (1st Dist.1973)). But UCC Article 3 and its collateral-impairment provision literally apply only to negotiable instruments, a category that does not include a separate guaranty such as that running from D.S. America (see *FDIC v. Hardt,* 646 F.Supp. 209, 211–12 (C.D.Ill.1986)).

As already suggested, neither party recognized this question at all—so neither addressed the question whether (and whence) ITT had a common-law duty of the same nature. But because the essence of the ITT position must be that it gave D.S. America identical protection to what the latter would have had under the language of the Agreement, anything that would bring the protection below that level would be fatal to ITT. That is enough for the present analysis, without having to probe deeper into Illinois law applicable to all guarantors in general.

██ Essentially, the first of ITT's three contentions is that any duty to protect the collateral was waived by this provision of the Agreement (capitals in original):

[I]t is understood that you [ITT] shall make NO WARRANTY OR GUARANTY of any kind or nature whatever re-

specting the conditions of said equipment or the state of title thereto.

To be sure, a guarantor can effectively waive protections to which it is normally entitled (see *Jacobson v. Devon Bank,* 39 Ill.App.3d 1053, 1056, 351 N.E.2d 254, 256 (1st Dist.1976)). But here ITT cannot take advantage of the exculpatory clause—no matter how broadly it can be read—given the way in which ITT structured the transaction with ColorComp.

Had ITT executed a finance lease to ColorComp in literal compliance with the Agreement, ITT would have retained title to the collateral. But with ColorComp having both possession and title, ITT's duty to perfect its security interest became vastly more important. In turn that magnified the importance of the purported waiver provision. Were it to be read as ITT now urges, that would create the material difference that D.S. America has been unsuccessful in identifying between a finance lease and a secured installment note. This Court concludes ITT's quoted disclaimer did not cause D.S. America to waive its right to ITT's maintenance of a valid security interest in the Dot Scanner and its accessories.

Next ITT claims its original filing statements contained a description of the collateral sufficient to perfect its security interest. Even under the liberal standard that any description of collateral is adequate if it "reasonably identifies what is described" (UCC § 9–110),[17] ITT's original security filings would fail. They did not list the Dot Scanner itself—only some of its components (Kopczenski Dep. 21) or accessories to the principal piece of equipment (Semeraro Dep. 43).

ITT Mem. III–6 contends the statement listing those components "together with all parts, accessories ... improvements and additions thereto" (Kopczenski Dep. Ex. 23) was enough of a description to secure an interest in the Scanner as a whole. To that end it cites *Interstate Steel Co. v. Ramm*

---

**17.** As n. 15 suggests, there is no need to decide whether the pertinent state law for the adequacy of the security filings is that of Illinois, Missouri or Texas. All three states impose similar requirements and tests for the adequacy of collateral description (see generally 8 Hawkland, Lord & Lewis, *UCC Series* §§ 9–110 ff. (Art. 9)).

*Manufacturing Corp.*, 108 Ill.App.3d 404, 64 Ill.Dec. 62, 438 N.E.2d 1381 (4th Dist. 1982). But *Interstate Steel, id.* at 407, 64 Ill.Dec. at 64, 438 N.E.2d at 1383 merely held the description of certain "property and all accessories, parts and equipment ... used in connection therewith" was sufficient to identify the equipment used to produce the specifically identified "property." That does not support the notion that merely mentioning "improvements and additions" to components of a larger machine is somehow effective to describe that larger machine itself. At best that would pose a factual issue precluding summary judgment. At worst, ITT would lose on the question.

■ That issue need not be resolved in light of ITT's final argument in this area. DSA Mem. II–8 and ITT Mem. III 6–7 concur that ITT's November 1985 supplement to the filings was effective to perfect its security interest in the Dot Scanner. That interest had not then been subordinated to any other ColorComp creditor. Unjustifiable impairments of collateral occur only when a party's actions result in a third party gaining a superior interest in the collateral (see *McHenry State Bank v. Y & A Trucking, Inc.*, 117 Ill.App.3d 629, 634, 73 Ill.Dec. 485, 489, 454 N.E.2d 345, 349 (2d Dist.1983) ("the failure of a secured party to perfect its security interest in collateral will discharge a guarantor to the extent the secured party's lien is subordinated to that of a third party"); 5 Hawkland & Lawrence, *UCC Series* § 3–606:11 (Art. 3)). Thus ITT's delay in gaining an effective security interest in the Scanner did not serve to discharge D.S. America's obligations under the Agreement.

D.S. America proffers an empty contention based on the provisions of federal bankruptcy law. Had ColorComp filed for bankruptcy protection within 90 days of ITT's November 1985 security filing, that belated perfection of ITT's security interest could have been set aside as a preferential transfer (see 11 U.S.C. § 547(b)). Thus ITT's delinquent filing did create a potential defect in its security interest—but one that did not materialize. Such an inchoate impairment of collateral is no more effective than the original defective filing to discharge D.S. America (cf. *Langeveld v. L.R.Z.H. Corp.*, 130 N.J.Super. 486, 327 A.2d 683, 686 (Ch.Div.1974) (guarantor not discharged under UCC by showing a hypothetical rather than an actual loss due to holder's treatment of the collateral), *rev'd in factual rather than legal terms*, 74 N.J. 45, 376 A.2d 931 (1977)). Accordingly, D.S. America's obligations under the Agreement were not released by ITT's handling of the security filings.

### Extension and Modification of the Principal Contract

■ D.S. America's final string to its bow is that its obligations under the Agreement were released when ITT twice modified its agreement with ColorComp without D.S. America's approval. D.S. America has cited a wealth of precedent holding modification of the principal contract, such as an extension of time for payment, will serve to discharge a guarantor (see, e.g., *Lee v. Pioneer State Bank*, 97 Ill.App.3d 97, 98, 53 Ill.Dec. 26, 27–28, 423 N.E.2d 218, 219–20 (3d Dist.1981)).

ITT Mem. II–4 retorts with the language of estoppel: D.S. America cannot use this traditional guarantor's defense because it had refused to honor its recourse commitment before each ITT renegotiation of the note.[18] That response carries the day for

---

**18.** ITT Mem. II–5 also asserts the two extension agreements with ColorComp were not the type of material alterations of the principal contract that would normally discharge D.S. America's collateral obligation. ITT correctly points out D.S. America's recourse obligation remained limited to the original three-year period, and the extensions arguably decreased the chances of ColorComp's default during that period. Nonetheless, modification of the principal contract without a guarantor's consent can still serve to discharge the guarantor, even if the modification was arguably in its best interests (see *Lawndale Steel*, 98 Ill.App.3d at 174, 53 Ill.Dec. at 294, 423 N.E.2d at 963). In that respect, there is another side to the "best interests" coin: D.S. America could also arguably have been prejudiced by losing the opportunity to take repossession of the equipment at an earlier date if and when ColorComp again defaulted (cf. *McHenry State Bank*, 117 Ill.App.3d at 633, 73 Ill.Dec. at 488, 454 N.E. at 348 (modification of

ITT.[19]

Equitable estoppel is a familiar and broadly applicable concept (18 I.L.P. *Estoppel* § 22, at 79 (1956)):

> Equitable estoppel may be defined as the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in chancery, from asserting rights which might otherwise have existed as against another person who has, in good faith, relied upon such conduct and has been led thereby to change his position for the worse....

Illinois cases have had surprisingly little occasion to apply that concept to a guarantor after repudiation of a guaranty commitment. Neither the sole case cited by ITT (*South Side Trust & Savings Bank of Peoria v. Peoria Harbor Marina, Inc.*, 101 Ill.App.3d 196, 56 Ill.Dec. 712, 427 N.E.2d 1258 (3d Dist.1981)) nor the single case uncovered by this Court (*Blackhawk Hotel Associates v. Kaufman*, 85 Ill.2d 59, 51 Ill.Dec. 658, 421 N.E.2d 166 (1981)) is directly on point, though of the two *Blackhawk Hotel* is substantially the more similar to this case. But in any event, the principles that generally inform courts in invoking estoppel certainly operate here.

In each instance ITT extended the note after D.S. America had refused to honor the Agreement. At that point ITT faced the alternative of suing D.S. America immediately or attempting to make the best available arrangement to maximize the prospects of ITT's being paid on the note. Litigation is expensive, chancy and time consuming (this lawsuit is living proof of

that). It would be grossly unfair to second-guess ITT's business decision to try to salvage ColorComp's repayment of the note rather than to choose to do battle with D.S. America immediately.[20] And when those good faith salvage efforts ultimately failed, ITT cannot now be prevented from seeking the protection for which it bargained in the Agreement. Like the guarantor in *Blackhawk Hotel*, 85 Ill.2d at 67, 51 Ill.Dec. at 662, 421 N.E.2d at 170, D.S. America—having refused to perform under the Agreement—cannot take shelter in ITT's post-refusal actions.

One last element of the estoppel question bears consideration before a final conclusion is reached in this area. When ITT first made a demand on D.S. America in August 1985, the latter refused not only because of the form the ITT–ColorComp transaction had taken but (as already discussed) because of ITT's failure to have protected the Dot Scanner through adequate security filings (Kopczenski Dep. Ex. 21). That last objection was valid. But that does not allow D.S. America to escape the operation of estoppel:

1. Because D.S. America's valid (but readily curable) objection to the security filings was coupled with its fundamental challenge to the very structure of the ITT–ColorComp transaction, ITT could not be faulted for its not having cleaned up the security filings, then returning to D.S. America to make another foredoomed demand.

2. As held earlier in this opinion, ITT's original imprecise security filings

---

the principal contract discharges a guarantor who lost "the opportunity to protect himself"). In any event, ITT denied D.S. America any participation in the decision to extend the note.

**19.** ITT Mem. II–4 also justifies its conduct in terms of its asserted duty to mitigate damages. This opinion need not resolve whether any such duty exists in the present guarantor context:
1. If ITT did owe (and breach) a duty to notify D.S. America before renegotiating ColorComp's obligations, D.S. America's guaranty would be discharged irrespective of the reasonableness of the renegotiation.
2. If estoppel does bar D.S. America from asserting such a discharge, it is enough for the renegotiation to have reflected ITT's bona fide judgment as to what was in its economic best

interests as the creditor—and such bona fides are unquestionable.

**20.** Though D.S. America has really foreclosed itself from challenging the particulars of the arms' length renegotiations, a brief look confirms the reasonableness of the $26,507.00 extension fee as part of the November 1985 extension. Payments from ColorComp had stopped about July 1985 (Kopczenski Dep. Ex. 11). Under the extension agreement, principal payments would not recommence until April 1986 (Kopczenski Dep. Ex. 14). It may be noted ITT did not require any extension fee as part of the second extension granted ColorComp (Kopczenski Dep. Ex. 16).

did not cause any injury to D.S. America. ITT was able to amend the filings before any third party acquired a superior interest in the equipment. D.S. America would not have been justified in repudiating the Agreement solely because of the potential yet unrealized defects in perfecting the security interest.

In summary, D.S. America was not relieved of its obligations under the Agreement by ITT's two modifications of the underlying contract with ColorComp. Except for the previously-identified factual issue as to whether D.S. America received what it bargained for when it entered into the Agreement, ITT would therefore be entitled to a judgment as to D.S. America's liability under the Agreement.

*Damages*

Rule 56(d) provides for the maximum benefit to be derived from an abortive summary judgment motion (emphasis added):

> **(d) Case Not Fully Adjudicated on Motion.** If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court ... shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. It shall thereupon make an order specifying the facts that appear without substantial controversy, *including the extent to which the amount of damages or other relief is not in controversy,* and directing such further proceedings in the action as are just. Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly.

On the damage front, ITT has submitted a sworn exhibit detailing the amount owed to it on the ColorComp note at the end of November 1986 as $241,065.80, with interest accruing since that date at $89.67 per day (ITT Ex. 9, Response to Int. 7 in D.S. America's First Set of Interrogatories (Ex. B)). DSA Mem. II–14 challenges ITT's calculation of the amount now owing and asserts that as a material issue of fact.

D.S. America's submissions are insufficient to create a material issue over damages. DSA Mem. II–14 argues ITT has failed (1) to show whether it has received any payment from other sources and (2) to explain how it calculated late charges or derived the applicable interest rate on the transaction. But ITT's proof consists of the affidavit of its Division Credit Manager Joseph Bronk, obviously reflecting the information drawn from ITT's records and the relevant mathematical calculations called for by the note. D.S. America had every opportunity during the discovery period to uncover evidence (if there were any) to contradict ITT's damage calculations (ITT's interrogatory response was delivered to D.S. America's counsel many months ago—February 16 of this year). Yet D.S. America has offered no evidence by way of affidavit, deposition response or any other permissible route to question (let alone undercut) ITT's submission.

That brings the teaching of *Anderson,* 106 S.Ct. at 2514 squarely into play:

> Rule 56(e) itself provides that a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.... This is true even where the evidence is likely to be within the possession of the [movant], as long as the [nonmovant] has had a full opportunity to conduct discovery.

And that alone requires rejection of D.S. America's challenge.

But there is more. D.S. America failed to note the calculation of damages as one of the seven genuine disputed issues listed in its statement filed (together with its Mem. II) under this District Court's General Rule 12(f). That being so, General Rule 12(f) calls for ITT's General Rule 12(e) statement to be "deemed to be admitted" by D.S. America (see *Keene Corp. v. International Fidelity Insurance Co.,* 561 F.Supp. 656, 663–65 (N.D.Ill.1982) (an identical holding as to the noncontroverted issue of damages, under the equivalent local rule of the Southern District of New York that served as the model for this District Court's later-adopted General Rules 12(e)

and 12(f)), *aff'd*, 736 F.2d 388 (7th Cir. 1984)).

Consequently ITT is entitled to summary judgment on the issue of damages (if it ultimately prevails as to liability). On the damages issue, there is no genuine issue of material fact. If D.S. America is held liable on the merits, the amount of that liability will be $241,065.80 in principal amount plus interest from and after December 1, 1986 at the rate of $89.67 per day.

### Conclusion

D.S. America loses on every aspect of its summary judgment motion. As for ITT, it prevails on most issues (including its claimed damage amount), but summary judgment as to liability is precluded by a single genuine issue of material fact. Its counsel is directed to prepare and submit to D.S. America's counsel on or before December 15, 1987 a proposed Rule 56(d) order stating *all* "facts that [from this opinion] appear without substantial controversy," with a view toward the presentation to this Court on or before December 29, 1987 of a jointly prepared order or, in the absence of agreement, opposing forms of a proposed order stating all such facts.[21] This action is set for a status hearing January 5, 1988 at 9 a.m.

---

**21.** This order does not of course contemplate D.S. America's surrender. What is rather anticipated is D.S. America's providing its suggested input to the proper form of order on the basis of the rulings reflected in this opinion.